[L. A. No. 9149. In Bank.—January 31, 1927.]

D. R. CRAWFORD, Respondent, v. IMPERIAL IRRIGATION DISTRICT et al., Appellants.

[1] CONTRACTS—INFLUENCING LEGISLATION—VALIDITY OF CONTRACT.— The employment of persons to influence legislation or to influence decisions of the Land Department, or even the decisions of judicial tribunals, in a proper way, is not against sound public policy, and a contract having such purpose is valid.

[2] ID.—IRRIGATION DISTRICT—RESOLUTION EMPLOYING PERSON TO INFLUENCE LEGISLATION—PROPER PURPOSES—PRESUMPTIONS.—Where a resolution of an irrigation district employing a person to secure the passage of legislation desired by the district plainly limits the services of the employee to appearing on behalf of the district before the various committees of Congress having under consideration a certain bill and presenting facts and arguments in support of said bill, the services are not against public policy or good morals and are legal.

---

1. See 2 Cal. Jur. 126; 6 R. C. L. 734.

[3] ID.—IMPERIAL IRRIGATION DISTRICT—AUTHORITY TO EMPLOY AGENT. The Imperial Irrigation District had authority, under its general powers, to employ an agent to appear before the appropriate committees of Congress to present facts and arguments in support of the Swing-Johnson Bill, which bill has for its purpose the enabling of the federal government to enter into a contract with the district which is the only means whereby said district can hope to obtain a supply of water for irrigation and domestic purposes and to secure protection from destruction of the lands therein by the flood waters of the Colorado River.

[4] IRRIGATION DISTRICTS—NATURE OF—MUNICIPAL CORPORATIONS.—An irrigation district is not strictly a municipal corporation but a public corporation for municipal purposes.

[5] ID.—POWERS OF IRRIGATION DISTRICTS.—An irrigation district, like any other public or private corporation, derives its powers from the statute under which it is created and from such other statutes as may have been enacted by the legislature granting it additional powers or limiting those already granted; and these powers are as different from those exercised by a strictly municipal corporation as the purposes of an irrigation district differ from those of a city or county or other strictly municipal corporation.

[6] PUBLIC OFFICERS—POWERS OF.—A public officer or board has not only the powers expressly enumerated by law, but also those implied powers which are necessary to the exercise of the powers expressly granted.

[7] APPEAL — AGREED STATEMENT OF FACTS — QUESTION OF LAW. — Where a case is submitted upon an agreed statement of facts without any other evidence whatever, findings of fact are unnecessary, and the only question before the court is as to what the law is applicable to those facts, and any findings of fact made by the court under these circumstances may be disregarded.

(1) 13 C. J., p. 431, n. 58, p. 432, n. 59. (2) 22 C. J., p. 147, n. 56, 57, 59. (3) 40 Cyc., p. 821, n. 23 New. (4) 40 Cyc., p. 817, n. 84. (5) 40 Cyc., p. 817, n. 85. (6) 40 Cyc., p. 821, n. 23 New. (7) 38 Cyc., p. 1973, n. 16, 17.

APPEAL from a judgment of the Superior Court of Imperial County. Walter Guerin, Judge. Reversed.

The facts are stated in the opinion of the court.

4.  See 26 Cal. Jur. 347.
5.  See 26 Cal. Jur. 403.
6.  See 21 Cal. Jur. 874; 22 R. C. L. 455.
7.  See 23 Cal. Jur. 913; 24 Cal. Jur. 953.

Charles L. Childers and A. C. Finney for Appellants.

A. L. Cowell, P. H. Griffin, H. J. Hankins, Jess E. Stephens, City Attorney of Los Angeles, W. B. Mathews, Clarence S. Hill, T. P. Wittschen and Markell C. Baer, *Amici Curiae.*

C. L. Brown and Harry W. Horton for Respondent.

CURTIS, J.—The Imperial Irrigation District, one of the defendants herein, is an irrigation district organized and existing under and by virtue of the California Irrigation District Act, approved March 31, 1897 (Stats. 1897, p. 254), and the acts amendatory thereof and supplementary thereto. The plaintiff is an elector and taxpayer of said district and the defendants, Mark Rose, Earl C. Pound, Ira Aten, C. W. Brockman, and W. O. Blair, constitute the board of directors of said district, and the defendant, F. H. McIver, is the duly appointed, qualified, and acting treasurer of said district. On October 23, 1925, at a regular meeting of said board of directors, the following resolution was adopted by said board: "Resolved that Imperial Irrigation District employ B. F. Fly at a salary of $250.00 per month and one-half of his actual and necessary expenses to appear on behalf of this district before the various committees of Congress of the United States having under consideration the Swing-Johnson bill, to present facts and arguments in support of said bill, said employment to commence on the 1st day of December, 1925." Thereafter the said B. F. Fly, referred to in said resolution, accepted said employment and agreed to perform the services required of him by said resolution in consideration of the payment to him of the salary and expenses provided for therein.

This action was instituted by plaintiff as an elector and taxpayer of said district to enjoin the defendant from auditing, allowing, or ordering paid any claim or demand for salary or expenses of the said B. F. Fly for services rendered pursuant to the terms of said resolution. The trial court held that said employment was illegal and gave judgment in favor of plaintiff in accordance with the prayer of his complaint. From the judgment in favor of plain-

tiff the defendants, other than defendant C. W. Brock-
man, have appealed. The contention of plaintiff, the re-
spondent herein, is that the contract of employment of the
said B. F. Fly by the Imperial Irrigation District is illegal
and void for two reasons. First, it is a contract to influence
legislation, and it is against public policy and for that
reason void; and, secondly, the defendant, the Imperial
Irrigation District, is without any authority to expend the
funds of said district for the purposes designated in said
resolution, even if the contract were not void as being
against public policy.

Considering the first point made by the respondent against
the validity of the contract employing Mr. Fly, it is evi-
dent from the terms of the resolution that the purpose of
employing him was to secure favorable action on the part of
the Congress of the United States in behalf of the Swing-
Johnson Bill mentioned in said resolution and then pending
before Congress. Appellants make no claim that this was
not the object and purpose of the district in the employment
of Mr. Fly. They do contend, however, that notwithstand-
ing that this was the object and purpose of said contract,
yet, as by the terms of the resolution, he is simply to appear
before the committees of Congress having said bill under
consideration and to present to said committees facts and
arguments in support of said bill, such employment is per-
fectly proper, and is not against good morals or contrary to
public policy. A contract somewhat similar to the one here
involved was before the supreme court in the case of *Foltz*
v. *Cogswell,* 86 Cal. 542 [25 Pac. 60]. In that action the
plaintiff sought to recover for services rendered by her in
the preparation of a certain bill to be presented to the
legislature of the state of California "and in making argu-
ments before the various committees of that body, in order
that the justice and merits of defendant's demand for the
passage of the bill might be fully understood." This court,
after quoting from the case of *Miles* v. *Thorne,* 38 Cal. 335
[99 Am. Dec. 384], used the following language: "In the
latter case, the court draws a distinction between the use
of personal, or any secret or sinister, influence upon legis-
lators, by one who seeks the passage of an act which it
holds to be contrary to public policy, and the open advocacy
of the same before the legislature or any committee thereof

in open session." This court held in the case of *Foltz* v. *Cogswell, supra,* that plaintiff was entitled to recover for the services performed in drawing said bill and advocating its passage before the various committees of the state legislature. In the case of *Bergen* v. *Frisbie,* 125 Cal. 168 [57 Pac. 784], the defendant, being the owner of timber land entries, employed the plaintiff as an attorney to influence the official action of the Secretary of the Interior favorably to the issuance of patents upon such entries without any stipulation for the use of improper means or methods. This court held: "We have carefully scanned the face of this contract, and find nothing whatever there to justify a judicial declaration that it is against good morals. There was no secrecy, no deception, no fraud, no corruption. . . . The means and manner to be employed are the all-important factors in marking the validity or invalidity of the contract. We see no one of its provisions that stamp it void as against public policy and good morals. Neither do we find anything in the evidence indicating any act done by the plaintiffs that to any degree could be construed improper. **[1]** The employment of persons to influence legislation, or to influence decisions of the land department, or even the decisions of judicial tribunals, in a proper way, is not against sound public policy, . . . The means and methods to be used must be improper, or else such employment is perfectly legitimate in the eyes of the law." The case of *Schweppe* v. *Sandberg,* 50 Cal. App. 507 [195 Pac. 454], involved the legality of a contract entered into by the defendant employing the plaintiff to present certain arguments before the State Highway Commission for the purpose of inducing the commission to so locate a proposed highway so as to pass through the defendant's lands. In holding that the contract was not illegal or against public policy or good morals the district court of appeal expressed itself as follows: "That the owner of property lying within a region through which it is proposed to construct a public highway, the precise route of which has not yet been determined upon by the public officials who are charged with the duty of selecting the same, may not honestly and in good faith present before such officials facts and arguments with relation to the merits of a particular route which, if selected, will run to or through his property, no one will for a moment

question, and it follows necessarily that what such prop-
erty owner may in good faith do in person in that regard
he may do through another, and he may for that purpose
select an attorney or agent to act as his representative in
presenting the merits of the particular location of said high-
way which he desires to have selected, and, hence, of course,
he may agree to pay his attorney, agent, or representative
a stipulated reward for the performance of such services.
There is nothing illegal or immoral or against public policy
in such a transaction or service.''

The only California case relied upon by respondent as lay-
ing down a different doctrine than that enunciated in the fore-
going authorities is the case of *County of Colusa* v. *Welch*,
122 Cal. 428 [55 Pac. 243]. This case was one brought
through the district attorney of Colusa county to restrain
the county treasurer of said county from paying the sum of
$1,000 upon a warrant issued by the county auditor in favor
of one B. S. Sprague. The county of Colusa was interested
in the defeat of a certain bill pending before the state legis-
lature, and so it was alleged in the complaint in said action,
''That if the sum of one thousand dollars 'was agreed to be
paid to said Sprague, it was to secure, by means of per-
sonal solicitation, and by means of private interview with
members of the legislature of California, and by means of
lobbying, the defeat of said senate bill.' '' A general de-
murrer to the complaint was sustained by the trial court.
The supreme court reversed the judgment and held that the
complaint stated a good cause of action. The decision of the
court upon this phase of the case was predicated upon those
allegations of the complaint wherein it was alleged that
Sprague was employed to secure the defeat of the bill by
means of lobbying as well as by other means. Lobbying has
a definite meaning in this state and it is made a crime both
by the constitution and statutes of this state (art. IV, sec.
35; Pen. Code, sec. 89). The court in this case cites with
approval the following statement from Cooley on Constitu-
tional Limitations: ''The law also seeks to cast its protection
around legislative sessions, and to shield them against cor-
rupt and improper influences, by making void all contracts
which have for their object to influence legislation in any
other manner than by such open and public presentation
of facts, arguments, and appeals to reason as are recog-

nized as proper and legitimate with all public bodies. While counsel may be properly employed to present the reasons in favor of any public measure to the body authorized to pass upon it, or to any of its committees empowered to collect facts and hear arguments, and parties interested may lawfully contract to pay for this service, yet to secretly approach the members of such a body with a view to influence their action at a time and in a manner that do not allow the presentation of opposite views, is improper and unfair to the opposing interest; and a contract to pay for this irregular and improper service would not be enforced by the law.'' We are, therefore, unable to find anything in the case of *County of Colusa* v. *Welch, supra,* opposed to the rule laid down in the other California cases cited above. They hold, and it must be accepted as the law in this state, as summarized in 6 Corpus Juris, page 126: ''The employment of persons to influence legislation, or to influence decisions of the land department, or even the decisions of judicial tribunals, in a proper way, is not against sound public policy. A distinction is drawn between the use of personal, or any secret or sinister, influence upon legislators, by one who seeks the passage of an act, which is contrary to public policy, and the open advocacy of the same. It is generally agreed that the appearance of a representative of an interested party before a public body to urge the adoption of a particular measure or policy is neither illegal nor improper when the means employed are open and have for their purpose the presentation of the merits of the advocated matter.''

[2] Turning now to the resolution of the Irrigation District employing Mr. Fly, we find nothing therein which in any way contemplates the use by Mr. Fly of any improper or illegal means to secure the passage of the legislation desired by the district. The resolution plainly states that Mr. Fly is employed to appear on behalf of the district before the various committees of Congress of the United States having under consideration the Swing-Johnson Bill and to present facts and arguments in support of said bill. His services are limited by the terms of the resolution to appearances before the various congressional committees having the bill under consideration and to the presentation before said committees of facts and arguments in support of said bill. ''It is the universal presumption of law that where a con-

tract can be performed legally, it will not be presumed that the parties intended to perform it in an illegal manner." (*Fites* v. *March,* 171 Cal. 487 [153 Pac. 926].) The very nature of the services to be performed under the resolution renders it practically impossible to perform them in any other way than in open advocacy of the bill, as the facts and arguments in support of the bill are to be presented before various congressional committees. These hearings as a rule, as we understand the procedure before them, are generally held in open and public sessions of the committees where not only the members of the committee and the parties interested in the pending matters but the public itself are free to attend. Services of this nature, as we have already seen, have been held in this state, without exception, to be not against public policy or good morals, but lawful and legal. The contention, therefore, that the contract of the district employing Mr. Fly to represent said district before the various congressional committees having in charge the Swing-Johnson Bill was void as being against public policy and good morals cannot be sustained.

[3] The other question presented upon this appeal involves the power and authority of the Imperial Irrigation District to enter into the contract employing Mr. Fly and to pay for his services from the funds of such district, even if such contract is not against public policy. The position taken by respondent is that as the purpose of such contract is to employ Mr. Fly to influence legislation, the district has no power to use the funds of said district for such purpose. [4] Respondent contends that an irrigation district is a municipal corporation and that the rule is well established that a municipal corporation has no authority to make an expenditure of public funds for the purpose of influencing legislation. While there is language to be found in some of the decisions of this state which might be taken as holding that an irrigation district is a municipal corporation (*People* v. *Cardiff Irr. Dist.,* 51 Cal. App. 307, 312 [197 Pac. 384]), we think that the great weight of authority is to the effect that an irrigation district is not strictly a municipal corporation (*Huck* v. *Rathjen,* 66 Cal. App. 84 [225 Pac. 33]; *Whiteman* v. *Anderson-Cotton-Wood Irr. Dist.,* 60 Cal. App. 234, 243 [212 Pac. 706]; *Turlock Irr. Dist.* v. *White,* 186 Cal. 183 [17 A. L. R. 72, 198 Pac. 1060]). In

the Turlock case the court said (page 187) : "The nature of an irrigation district has been a matter of judicial investigation and interpretation, and it has been held that such a corporation is not a municipal corporation, but a 'public corporation for municipal purposes.' " (Citing authorities.) "As to swamp-land, drainage, levee, and reclamation districts, similar to irrigation districts, it has been held that they were not municipal corporations." (Citing authorities.) In *Bettencourt* v. *Industrial Acc. Com.*, 175 Cal. 559 [166 Pac. 323], it was held on page 561 that: "But reclamation districts organized as was this petitioner possess no political nor governmental powers, are not organized for political or governmental purposes, and are therefore not public corporations at all. Indeed, they are not in strictness corporations, public or private, but governmental mandatories or agents vested with limited powers to accomplish limited and specific work." It is not necessary for our purposes to determine the strict legal status of an irrigation district, but it is evident from the decisions of this state, only a few of which have been referred to above, that an irrigation district is not strictly speaking a municipal corporation. This circumstance only becomes important when we come to examine certain authorities relied upon by the parties hereto which will be later referred to.

[5] An irrigation district, like any other public or private corporation, derives its powers from the statute under which it is created and acts, and from such other statutes as may have been enacted by the legislature granting it additional powers or limiting those already granted. These powers are as different from those exercised by a strictly municipal corporation as the purposes of an irrigation district differ from those of a city or county or other strictly municipal corporation. We must, therefore, consult the statutes of the state in the first instance, at least, to determine the extent of the powers which may be legally exercised by an irrigation district. The extent of these powers is found in the main in those sections of the statutes defining the powers of boards of directors of such districts. The principal provisions of the statutes affecting the powers of boards of directors are contained in the following sections of the statutes of our state:

Section 15 of the California Irrigation District Act of 1897, under which the Imperial Irrigation District was organized and is now operating, provides:

"The board of directors shall have the power and it shall be their duty to manage and conduct the business and affairs of the district; make and execute all necessary contracts; employ and appoint such agents, officers, and employees as may be required, and prescribe their duties. . . . Said board shall also have the right to acquire, by purchase, lease, contract, condemnation, or other legal means, all lands, and waters, and water rights, and other property necessary for the construction, use, supply, maintenance, repair and improvements of said canal, or canals, and works, whether in this or in other states or in a foreign nation, including canals, and works constructed and being constructed by private owners, lands for reservoirs for the storage of needful waters, and all necessary appurtenances, and also where necessary or convenient to said ends to acquire and hold the stock of other corporations domestic or foreign owning waters, canals, waterworks, franchises, concessions or rights. Said board may enter into, and do any acts necessary or proper for the performance of, any agreements with the United States, or any state, county, district of any kind, public or private corporation, association, firm or individual, or any number of them, for the joint acquisition, construction, leasing, ownership, disposition, use, management, maintenance, repair or operation of any rights, works or other property of a kind which might lawfully be acquired or owned by the irrigation district, and may acquire the right to store water in any reservoirs or to carry water through any canal, ditch or conduit not owned or controlled by the district, . . . "

Section 15b of said act further provides that: "The board of directors of any irrigation district may also construct the necessary dams, reservoirs, and works for the collection of water for said district, and do any and every lawful act necessary to be done, that sufficient water may be furnished to each land owner in said district for irrigation and domestic purposes; . . . "

Section 15c provides, among other things, that: "Said board shall have power generally to perform all such acts

as may be necessary to fully carry out the purposes of this act.''

In addition to these sections of the Irrigation District Act, section 1 of the act of 1915 (Stats. 1915, p. 1) provides:

''The board of directors of irrigation districts having an area of more than five hundred thousand acres may expend such sums as may to them seem necessary for the protection of the canal system of such district or of lands within such districts from damage by flood and from the overflow of rivers and may contribute funds for that purpose to be expended by or jointly with the government of the United States of America, or other governments or persons benefited by the same protective work or works. The board of directors of any such irrigation district may also do all things necessary to insure such irrigation system and the lands within such district from any such damage by flood or overflow without first receiving a petition of land owners or freeholders for holding an election to authorize such expenditure.'' This act has been held to be constitutional and applicable to the Imperial Irrigation District (*Wores* v. *Imperial Irr. Dist.*, 193 Cal. 609 [227 Pac. 181]).

To briefly epitomize the terms of these sections of the statutes we find that the board of directors of an irrigation district is given power generally to manage the affairs of the district; to execute all necessary contracts; to employ and appoint all agents, officers, and employees and define their duties; to acquire water rights, canals, maintain waterworks, whether in this or any other states or in a foreign nation; to enter into any agreement with the United States or any state or other corporation, public or private or individual, for the joint acquisition, construction, maintenance, or operation of any rights or works that might be lawfully owned by an irrigation district; to do any and all lawful acts necessary to be done that sufficient water may be furnished to the inhabitants of the district for irrigation and domestic purposes and to perform all acts that shall be necessary to fully carry out the purposes of the act under which said district was formed. In addition to these powers conferred generally upon irrigation districts, the board of directors of the Imperial Irrigation District, under the act of 1915, may expend such funds of the district as they may deem necessary for the protection of the canal system and the lands of

the district from damage by flood or the overflow of rivers and may contribute funds to be expended for that purpose by or jointly with the government of the United States of America or other governments or persons benefited by such protection work. From these provisions of the statutes we are impressed with two outstanding features of this legislation. First, that the prime object and purpose of such an organization is to provide water for the use of its inhabitants and land owners for irrigation and domestic purposes, and, secondly, the broad and comprehensive nature of the powers conferred upon the board of directors in order to enable them to accomplish this purpose. We also might emphasize another feature which stands out prominently in this legislation and which, in our opinion, is important in the determination of the question now under consideration. This is the minute particularity and definiteness with which the legislature has given the board of directors power to contract with the United States government as well as with individuals and other public and private corporations for the purposes of acquiring water rights and constructing and operating waterworks and expressly authorizing the district to contribute funds of the district for the purpose of construction of works to be erected by the United States, or jointly by the United States and the district, for the purpose of protecting the canal system and lands of the district from river overflow. In order to perform these duties and execute the powers thus given to the board of directors of the Irrigation District, it is apparent that it may be necessary for the board to adopt some means of bringing to the attention of the United States government or other governments with which the district may wish to enter into contracts the subject matter of the proposed contracts. It also seems apparent to us that occasions may arise when it will be absolutely necessary in the best interests of the district that it be represented in person before the proper boards or instrumentalities of these governments in order that the claims of the district as to the matters before these boards may be understood by the officials charged with the consideration of such matters. In bringing about the execution of a contract with the United States government, such as securing rights of way over the public domain for a canal

system or the right to take water from a stream under government control and jurisdiction, it may be necessary for the applicant to be represented, either in person or by a duly appointed agent before the Department of the Interior or some board or committee having charge of such matters, and perhaps before Congress itself, when the matters require congressional action, in order to properly present the interest of said district. We think there is no question if the Imperial Irrigation District found it necessary to secure a right of way over the public domain for its canal system, and this right could only be had by the district making a proper showing before the Department of the Interior, that the board of directors would have the power to send a representative before such department for the purpose of properly presenting such matter before said department. And if the project, which the board of directors finds is necessary in order to carry out some of its prescribed duties, requires congressional action before the same may be performed by the district, then we can see little or no difference in sending a representative to present the facts bearing upon the subject of the proposed legislation before the proper committees having the same under consideration than in sending such a representative before the Department of the Interior to present a matter there pending in which the district is interested. To withhold such authority in either case would be to cripple unnecessarily the power of the district to accomplish the purposes of its formation, and might seriously hamper the district in its efforts to secure the very contracts which the statute expressly authorizes it to make and execute with the United States government.

The Swing-Johnson Bill authorizes the construction of a dam in the Colorado River at a point in or near Boulder Canyon and also the construction of a canal from the Laguna Dam in said river to the lands of the Imperial Irrigation District. The dam and canal are to be built according to the terms of said bill by the United States government and the former is to be paid for by revenues to be derived from the leasing of power privileges incident thereto and the latter by the lands to be benefited thereby. This case was submitted in its entirety upon an agreed statement of facts. This statement recites at some length the problems of the Imperial Irrigation District and its efforts to secure an ade-

quate water supply for the use of its inhabitants for irrigation and domestic purposes, and protection of the district from the flood waters of the Colorado River. It is not necessary to enter into the details of this lengthy statement of facts. A portion of paragraph XIV of the agreed statement reads as follows: "It is necessary that said Swing-Johnson Bill or similar legislation by the Congress of the United States, be enacted in order that water may be furnished to the land owners within the boundaries of Imperial Irrigation District for irrigation and domestic use and that it is necessary that said Swing-Johnson Bill or similar legislation be passed by the Congress of the United States to prevent the destruction of the properties of the said district and the inhabitants thereof from floods of the Colorado River; . . . that said Swing-Johnson Bill is designed primarily for the relief and benefit and protection of the Imperial Irrigation District." From another portion of the agreed statement of facts it appears that the only source from which said district can secure an adequate or, for that matter, any supply of water is the Colorado River and, furthermore, due to the fact that said district is situated from one hundred to three hundred feet below the river-bed of said river, it is seriously menaced by having its lands overflowed and destroyed by the flood waters of said river. In fact, it is expressly stipulated as to the flood menace that "within a period of from ten to twenty years the basin where the river now flows will be entirely filled with silt and sediment and that in that event there will be no place for the river to flow except into the Imperial Valley and onto the lands within the Imperial Irrigation District, and that the river will so flow into said district and completely inundate and destroy the same and the property values therein and drive the inhabitants therefrom if adequate means are not promptly provided to thoroughly regulate the river, desilt the water, and control the floods by means of one or more great storage reservoirs in the upper reaches of the river."

The district is not financially able to construct said dam and canal, and if it were able it has no authority from the United States or the states in which said dam would necessarily have to be located to build said dam. From these facts it appears that the only means whereby said district can hope to obtain a supply of water for irrigation and do-

mestic purposes and to secure protection from destruction of the lands therein by the flood waters of the Colorado River is through a contract with the United States government. It is the object and purpose of the Swing-Johnson Bill to enable the government to enter into such a contract with the district. The purpose of employing Mr. Fly and sending him to Washington is to enable the district, through him, to present the facts bearing upon the subject matter of the proposed legislation before the committees in Congress having this bill under consideration. We think it is plainly within the powers of the board of directors of said district to furnish to Congress all the information in its possession which might tend in any manner to enlighten the members of that body upon the pending bill, and if in the judgment of the board of directors this can best be done by having a representative of the district appear personally before the committees of Congress, then in our opinion said board of directors is authorized to employ and send to Congress such a representative.

We do not think this conclusion is contrary to any of the authorities cited by the respondent and the *amici curiae* in this action. The cases mainly relied upon by them as announcing a different doctrine are *County of Colusa* v. *Welch,* 122 Cal. 428 [55 Pac. 243], *Valentine* v. *Robertson,* 300 Fed. 521, and *State ex rel. Rice* v. *Bell,* 124 Wash. 647 [215 Pac. 326]. In the first two of these three cases the right of a strictly municipal corporation to employ a representative to appear before a legislative body to influence legislation in which the municipality had only an indirect interest was involved. In each case it was decided that no such authority was given to the governing body of such municipality and that public funds could not be expended for such purpose. In the case of *State ex rel. Rice* v. *Bell, supra,* the supreme court of the state of Washington decided that an irrigation district known as the Quincy Valley Irrigation District, organized under the laws of that state, had no authority to pay the expenses of its engineer in attending the Western States Irrigation Congress, held at San Francisco, for the purpose of interesting said irrigation congress in a bill then pending before the Congress of the United States known as the Jones Bill, the passage of which it was thought would be of great benefit to said irrigation

district.  The court held that the district had no authority
to expend public funds to pay the expenses of said engineer
in attending said congress.  The Jones Bill, so called, was
not a measure affecting directly the Quincy Valley Irriga-
tion District, but was a bill applying generally to any irri-
gation district authorized to issue bonds, and providing
a plan whereby the interest on bonds issued under certain
conditions might be guaranteed by the United States govern-
ment.  It is obvious that the conditions under which the
engineer of this irrigation district was employed differ mate-
rially from those surrounding the employment of Mr. Fly
by the Imperial Irrigation District.  It is to be further
noted that all the authorities relied upon by the court in
that decision were cases in which the right of a strictly
municipal corporation to make expenditures of public funds
was involved.  In other words, the supreme court of Wash-
ington applied the rule applicable to strictly municipal cor-
porations to irrigation districts and accordingly held that
the latter were without power to make expenditures of pub-
lic money for the purposes shown by the facts of said case.
This, as we have already seen, we have declined to do, for
the reason, as we view the subject, irrigation districts, at
least in this state, in certain respects, and particularly in
regard to their power to provide the necessary water for the
use of lands within the district and to protect them from
flood waters, are clothed with most extensive powers, suffi-
cient, we believe, at least to authorize a contract of the
character herein under consideration.  For this reason we
are unable to accept as an authority in the present action the
case from the supreme court of the state of Washington.

Neither do we find anything in section 61 of the California
Irrigation District Act of 1897 which would lead to a con-
clusion contrary to that which we have expressed above.
This section provides: "The board of directors or other
officers of the district shall have no power to incur any debt
or liability whatever, either by issuing bonds or otherwise,
in excess of the express provisions of this act; and any debt
or liability incurred in excess of the express provisions shall
be and remain absolutely void; . . . "  We think that we
have already shown that the employment of Mr. Fly was
within the express provisions of the Irrigation Act.  It is
true that there are no express words to be found in the stat-

ute authorizing the board to employ a person to attend upon the sessions of Congress in the interest of legislation affecting the district. In like manner there is no express provision of the statute authorizing the board of directors to rent a building in which to carry on the business of the district, but the board is by the terms of the statute authorized to "manage and conduct the business and affairs of the district." The power to carry on the business of the district implies the power to do all things required for that purpose, and this would include the renting of a building in which to transact the business of the district, and a debt or liability incurred for the reasonable rental of a building for such purposes would not be in excess of the express provisions of the act. For like reason it has been held that the board of supervisors, under their general powers to supervise the official conduct of all county officers, may employ an expert to examine the books of said officers (*Harris* v. *Gibbins*, 114 Cal. 418 [46 Pac. 292]), and the state board of examiners, under the law as it then existed, defining its powers, which did not include any express authority to employ an expert, might under its general powers appoint such an employee to assist said board in the performance of its duties. (*Lewis* v. *Colgan*, 115 Cal. 529 [47 Pac. 357].) **[6]** "A public officer or board has not only the powers expressly enumerated by law, but also those implied powers which are necessary to the exercise of the powers expressly granted, . . . " (21 Cal. Jur. 874.) So the power to acquire lands and water rights, construct canals and reservoirs, build levees, and otherwise protect property from flood water, and to enter into contracts with private individuals and public corporations and with the several states and the national government, is given to the board of directors of an irrigation district by the express provisions of the act. In the exercise of this power the board of directors have authority to perform all lawful acts necessary to be done in order to accomplish any or all of these purposes. All of these acts, therefore, would be within the express provisions of the act, and any liability incurred by the district in the performance of any of said acts would be a legal claim against the district and entitled to be paid from the funds of said district. Such a liability could not in any way be held to be void as incurred in excess of the express provisions of the act.

There is nothing, therefore, to be found in the provisions of said section 61 which affects the legality of the Fly contract.

[7] The judgment is reversed. As the case was submitted upon an agreed statement of facts without any other evidence whatever, findings of fact were unnecessary (24 Cal. Jur. 953). The only question, therefore, before the court was as to what was the law applicable to those facts (*Gregory* v. *Gregory*, 102 Cal. 50 [36 Pac. 364]; *McMenomy* v. *White*, 115 Cal. 339 [47 Pac. 109]). Any findings of fact made by the court under these circumstances may be disregarded. The trial court is therefore directed to enter a judgment in favor of the defendants, denying plaintiff the relief sought by the complaint herein.

Richards, J., Seawell, J., Preston, J., Langdon, J., and Waste, C. J., concurred.

Shenk, J., being disqualified, did not participate in the decision.