[Civ. No. 12510. First Dist., Div. One. Jan. 13, 1944.]

RUSSELL POWELL, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Phil F. Garvey for Appellant.

John J. O'Toole, City Attorney, for Respondents.

WARD, J.—Plaintiff prosecutes this appeal from a judgment of nonsuit. He is a resident and taxpayer of the city and county of San Francisco, and brought the action for the purpose of enjoining the expenditure of public funds in the payment of traveling and per diem expenses of city officials to and from Washington, D. C., in the presentation of legal and engineering studies to a committee of Congress. (Charter of the City and County of San Francisco, § 27.) It was contemplated that such expenses would be incurred in the advocacy of an amendment to the Raker Act, enacted by the 63rd Congress of the United States of America (H. R. 7207), to permit the sale by the municipality to a public utility corporation of electric power for resale to the people of San

Francisco. It had been judicially held that an agency contract to that end theretofore entered into violated the terms of the act, which granted certain rights of way over federal public lands and national parks to the city and county of San Francisco for the purpose of supplying water and electrical energy to the public. The mayor of San Francisco, therefore, upon authorization of the board of supervisors, appointed a committee of citizens (subsequently known as the committee), to introduce an amendment to the Raker Act. Following its introduction in Congress, it was there referred to the Public Lands Committee, a subcommittee of which visited San Francisco for the purpose of investigating the propriety of the amendment. Public hearings upon the amendment terminated about the time of the Japanese attack on Pearl Harbor in December, 1941, with the understanding that further hearings would be held in Washington before the full committee on a date to be set. In pursuance of this understanding the board of supervisors passed an ordinance appropriating $10,000 out of the unappropriated balance in the Hetch Hetchy Power Division to provide funds for the payment of expenses of certain designated city and county officials, etc., to be incurred in connection with the hearings before the congressional committee. Subsequently the board of supervisors approved a resolution, directing the manager of utilities, two members of the board of supervisors, the city attorney and two public utility engineers to represent the city and county before the Public Lands Committee.

Shortly prior to the time when it was necessary for these representatives to leave for Washington this action to enjoin the expenditure, and praying for a temporary injunction, was filed. Confronted by this emergency the committee hereinbefore mentioned made advances to cover such expenses, obtaining receipts from the heads of city departments. It was understood that should the claims be allowed by the city and county, the advances would be repaid. The amount appropriated by the supervisors was $10,000; the expenses incurred totaled $4,105.54.

Plaintiff contends that the circumstance that the members of the committee were not personally out of pocket affords an additional reason for restraining the proposed disbursement of public funds. This contention is not supported by authority nor by convincing argument. It does not appear from

the evidence that the city was prejudiced, or that the advancement of the funds was to promote the individual interests of those advancing the money, or intended in anywise to influence the position that the city desired its official committee to take before Congress in its efforts to protect the interest of the municipality. On the trial of this cause some questions were asked indicating a misuse of the funds by individual members, but on appeal it seems to be admitted that there was no misuse of funds.

■ Plaintiff contends that the purposes for which municipal funds may be used does not include expenses to urge enactment of an amendment to a congressional act empowering the city and county to use certain lands, water and power of the United States Government. This contention seems to be without merit if the funds were properly and legally appropriated under the city charter from the particular fund used. The propriety of the action of the municipality will be first considered.

Plaintiff relies upon *Mines* v. *Del Valle,* 201 Cal. 273 [257 P. 530] and *Mobley* v. *Board of Public Works,* 44 Cal.App. 167 [186 P. 412]. In the Mobley case it was pointed out that the charter provided a precise method of acquiring a privately owned railway system and that the word "extension" had reference to improvements to an existing municipal system and not to the use of funds in investigating the advisability of "acquiring" an independent railway system. In the Mines case, the Charter of Los Angeles (§ 192(h)) empowered the public service commissioners to use money in the power revenue fund for the purpose of " 'conducting, operating and maintaining and extending the business of said department pertaining to electric power,' and particularly upon the words 'extend electric plants, works,' etc., and 'extending the business of said department.' " It appears that the commissioners carried on a campaign, addressed to the purpose of influencing the voters of the municipality to approve a bond issue, using power revenue funds to pay for newspaper advertisements, circulars, posters, banners, etc. At pages 282-283 the court said: "The provisions of the charter giving to the board of public service commissioners power to extend the electrical plants and works of said city and to expend the funds in the power fund for the purpose of extending said public utility in our opinion refer simply to the

physical management of the same and cannot be enlarged to include another and distinct power, that of raising money either directly or indirectly for the purpose of conducting and operating said utility, or for the purpose of extending the business thereof.'' Quoting from the Mobley case the court further said (pp. 284-285) : '' 'Without regard to any other question discussed in the opinion of the district court of appeal, we are satisfied that the charter of San Francisco, as now written, does not authorize the payment of money from the funds of the municipal railway system for the purpose of investigating the condition and availability of a part or the whole of another street railway with a view to its purchase. The purposes for which expenditures from such fund can be made are carefully specified in section 16, article XII, of the charter, which, we think, excludes any such expenditure as here proposed. Such an *investigation* may not fairly be held to constitute an ''extension or improvement'' of the municipal system.' '' The Mines case held that a municipality in its proprietary capacity does not have power to do any and all things in the conduct of its business, and that the use of public funds on one side to advocate a controversial question before the voters was unjust to the rights of the members of the public who held a contrary opinion, in view of the fact that there was neither an express nor an implied provision in the charter authorizing an expenditure of public money for banners, etc.

In *Mahoney* v. *San Francisco*, 201 Cal. 248 [257 P. 49], it was held that when municipal revenue is allocated to separate funds the money in one fund may not be used for another purpose unless there is a specific provision therefor. As will appear hereafter there is a provision for the use of municipal funds for the purpose here contemplated.

There is a difference in the expenditure of money in acquiring a new system and in protecting the rights of that acquired. That the Supreme Court of this state recognized that there is a difference between the expenditure of funds for election purposes and the use of money to pay expenses in appearances before a judicial or legislative body is demonstrated when the holdings in two cases decided within a six months' period—the Mines case and *Crawford* v. *Imperial Irrigation Dist.*, 200 Cal. 318 [253 P. 725]—are considered. In the Crawford case, *supra,* page 322, the court said : '' 'The

employment of persons to influence legislation, or to influence decisions of the land department, or even the decisions of judicial tribunals, in a proper way, is not against sound public policy, . . . The means and methods to be used must be improper, or else such employment is perfectly legitimate in the eyes of the law.' '' Quoting from 6 Corpus Juris, page 126, the court further said: '' 'A distinction is drawn between the use of personal, or any secret or sinister, influence upon legislators, by one who seeks the passage of an act, which is contrary to public policy, and the open advocacy of the same. It is generally agreed that the appearance of a representative of an interested party before a public body to urge the adoption of a particular measure or policy is neither illegal nor improper when the means employed are open and have for their purpose the presentation of the merits of the advocated matter.' '' There is no evidence in the present case that the commission or its designated representatives in appearing before the congressional subcommittee in San Francisco or the full committee in Washington were actuated by any motive other than the legitimate protection of the city's interest as it reasonably and honestly appeared to the commission. In the Crawford case, quoting from 21 Cal.Jur. 874, the court said (p. 334): '' 'A public officer or board has not only the powers expressly enumerated by law, but also those implied powers which are necessary to the exercise of the powers expressly granted, . . .' '' As late as June of 1943 the Crawford case, to the effect that authority is often implied from power granted, was quoted with approval in *California Drive-in Restaurant Assn.* v. *Clark*, 22 Cal.2d 287 [140 P.2d 657]. (See, also, 67 A.L.R. 686.) In addition, attendance at legislative and congressional sessions has been authorized by the laws of the State of California for advocacy of the passage of beneficial, or opposition to that of detrimental, legislation. (Deering's Gen. Laws, 1941 Supp., Act 4276, § 1, p. 2064; *California etc. Assn.* v. *Rindge L. & N. Co.*, 199 Cal. 168 [248 P. 658, 47 A.L.R. 904].) We conclude that the purpose in the appointment of the San Francisco representatives to attend and present the facts in the interest of the city and county of San Francisco was, under all the circumstances as they appear in the record, proper.

The procedure adopted was as follows: The board of supervisors appropriated a specified sum out of the ''unap-

propriated balance" in the Hetch Hetchy Power Division for the use of representatives in connection with hearings before Congress on the proposed amendment to the Raker Act. Subsequently the board approved the committee appointed to represent the city at such hearings. The members of the committee—in one instance there was a substitute for one of them —carried out their mission. The question therefore is whether the ordinance authorizing the expenditures violated the provisions of the charter.

Section 127 of the charter provides: "Receipts from each utility operated by the commission shall be paid into the city and county treasury and maintained in a separate fund for each such utility. Appropriations from such funds shall be made for the following purposes for each such utility in the order named, viz.: (a) for the payment of operating expenses, pension charges, and proportionate payments to such compensation and other insurance and accident reserve funds as the commission may establish or the board of supervisors may require; (b) for repairs and maintenance; (c) for depreciation as hereinafter described; (d) for the payment of interest and sinking funds on the bonds issued for acquisition, construction or extensions; (e) for extensions and improvements; and (f) for a surplus fund." Section 128 provides for the disposition of funds for reconstruction and replacement. Section 129 provides that "If any accumulation in the surplus fund of any utility shall, in any fiscal year, exceed 25 per cent of the total expenditures of such utility for operation, repairs and maintenance for the preceding fiscal year, such excess may be transferred by the board of supervisors to the general fund of the city and county, and such amount shall be deposited by the commission with the treasurer to the credit of such general fund." The sections relate to receipts from utilities. Hetch Hetchy project is one of several utilities operated by the city. The appropriation for expenses was from the particular fund involved; that is, the separate fund of Hetch Hetchy for "operation." Whether the money was to be taken from a "surplus" fund, as provided in the ordinance, or from an "unappropriated balance" as set forth in the appropriation itself, seems to be immaterial. The charter authorizes the payment of traveling expenses, including Pullman charges, and a reasonable amount per diem for necessary expenses, except in the discharge of routine duties. (§ 219.)

In the Mobley case it was held that an *"investigation"* could not be held to be an "extension." In the Mines case it was held that there was no express authorization in the charter for the "extension" "nor can it be implied from any of the terms thereof" (p. 288).

The distinction between the present case and that principally relied upon by appellant is that in the Mines case the expenditure was for the purpose of "carrying on a campaign for the purpose of influencing the voters" (p. 287) in favor of an "extension." The court specifically differentiated between the operation or extension of a municipal public utility and "the raising of the money to extend said system" (p. 282).

In the present case the money was not allocated for the purpose of extending the system under the circumstances of the Mines case, or to investigate the desirability of a purchase as in the Mobley case. The purpose here was to continue a going business by seeking the approval of Congress to the continuance of a contract under which the municipality was operating with a private concern. The legality or illegality of that particular contract is not involved on this appeal. There is no evidence in the record disclosing a dishonest intention on the part of the municipality. (*Mahoney* v. *San Francisco, supra; Mines* v. *Del Valle, supra.*) The vital question is—under the implied provisions of the charter, may the action of the board of supervisors in appropriating the money as part of operating expenses be legally authorized? (*Mines* v. *Del Valle, supra.*)

■ "Operating expenses" usually cover physical maintenance, and may include administration, labor, interest, taxes, rent, insurance, claims, litigation expenses, etc., depending upon how the phrase is used in a particular case. (Words and Phrases, vol. 29, p. 555, et seq.; 46 C. J., p. 1112, § 5.) When the expenses, as in the present case, are under the control of a governmental agency, they may include such as are necessary or required by the governing body to promote or maintain before legislative bodies the interest of the utility. ■ The term "operating expenses" as used in the San Francisco Charter is not confined to maintenance, but expressly refers to reserve funds, including pensions, accident compensation, etc. ■ The power of a board of supervisors to pass an ordinance, or the power of a board or commission to adopt reasonable rules to make effective

the purpose of the establishment of the commission under an express grant may sometimes be implied in the absence of legislative prohibition. (*California Drive-in Restaurant Assn.* v. *Clark, supra; Bank of Italy* v. *Johnson,* 200 Cal. 1 [251 P. 784] ; *Crawford* v. *Imperial Irrigation Dist., supra.*)

The opinion in *O'Connell* v. *City and County of San Francisco,* 204 Cal. 1 [266 P. 1118], decided subsequent to the Crawford and Mines cases, does not set forth the facts of the case but the record on appeal discloses it to have been a suit in equity to compel the return of money paid by the city to a supervisor who had advanced the expenses of the Mayor, several attorneys, engineers and his own "to, and in, and returning from Washington, D. C.," for the purpose of persuading the Secretary of the Interior to approve a written contract of sale to a private corporation of products of the Hetch Hetchy project. By ordinance the board of supervisors had authorized the payment from the "Hetchy Hetchy Operative Revenue Fund." The complaint alleged that there was no such fund out of which the demand could lawfully be paid. The charter in effect at that time used the term "operating expenses" and "reserve fund." A general demurrer to the complaint was sustained. On appeal the Supreme Court evidently did not consider the Mines opinion applicable to the facts in the O'Connell case, and filed the following opinion quoted in its entirety: "Upon a careful examination of the record herein, we are satisfied that the plaintiff's complaint failed to state a cause of action; that the demurrer thereto was properly sustained, and that the judgment in favor of the defendants thereon was correctly given and made, and that this appeal is without merit."

In conclusion it may be said that the record does not show that the visit to Washington was made in bad faith. It was a matter for the board to determine, without interference from a court, whether the purpose was necessary and in good faith. The funds expended are legally a charge against the municipality. In *San Francisco* v. *Boyd,* 17 Cal.2d 606 [110 P.2d 1036], in considering the power of the board of supervisors it was held, assuming the purpose to be proper (pp. 617-618) "that 'the enumeration of some powers does not exclude the exercise of powers not enumerated except as limited by the charter and the Constitution' (*West Coast Advertising Co.* v. *San Francisco,* 14 Cal.2d 516, 523

[95 P.2d 138]); that where a charter is silent a city may exercise powers conferred upon it by general law provided such general powers are not inconsistent with those granted by the charter; if no restrictions or limitations are found in the charter, the power of the city in municipal affairs is full and complete." We find no such limitation or restriction in this case. It is not the function of this court "to interfere with such determination." (*San Francisco* v. *Boyd, supra,* p. 614.)

The judgment is affirmed.

Knight, J., concurred.

PETERS, P. J.—I dissent. I am of the opinion that the Charter of the City and County of San Francisco expressly prohibits the expenditure of moneys from the Hetch Hetchy fund for the purposes here involved.

The basic facts are as follows: On December 1, 1941, the board of supervisors purported by ordinance to appropriate $10,000 out of the "unappropriated balance in the Hetch Hetchy Power Division" to provide funds to defray the expenses of the mayor, city attorney, representatives of the public utilities commission and two members of the board of supervisors for a trip to Washington, D. C., so that such persons could appear before a congressional committee to urge the adoption of an amendment to the so-called Raker Act, which amendment was deemed vital to the interests of the city by a majority of the board. The proposed amendment would have authorized the utility to dispose of its power in a manner prohibited by existing law. The sole question involved is whether the board of supervisors had power to appropriate money from *that* fund for *that* purpose.

I agree with the majority opinion insofar as it holds that where a charter does not prohibit or expressly permits such expenditures that such expenditures do not violate public policy. There can be no doubt that under such circumstances governmental agencies may properly send their representatives to Washington, D. C., to appear before congressional committees to urge, in a proper manner, the adoption or defeat of legislation which the governing body deems necessary for the protection of the governmental agency involved. In my opinion there can be no reasonable doubt but that the city of San Francisco lawfully could have appropriated

money from its general fund for this purpose. The real question here presented is not whether the challenged power would exist in the absence of express prohibition, but whether the charter of San Francisco prohibits the use of Hetch Hetchy funds for the purpose here under discussion. This is purely a question of interpretation. If the people of San Francisco, in an attempt to prevent dissipation of the utility's funds, have seen fit to rigidly prohibit the expenditure of the utility's funds except for certain designated purposes, and if the purpose here involved does not fall within the permitted categories, the board of supervisors simply lacks power to expend the money for the challenged purpose. In my opinion, a reading of the pertinent provisions of the charter demonstrates to a certainty that the charter prohibits appropriations from the Hetch Hetchy fund for the purpose here involved.

The applicable sections of the charter are quoted in the majority opinion, and need not be again quoted in their entirety in this dissent. Section 127 is the basic section. It requires all receipts from each utility, of which Hetch Hetchy is one, to be deposited by the public utilities commission in the city and county treasury "and maintained in a separate fund for each such utility." The section then provides that appropriations from such separate funds shall be made for certain designated purposes. Subdivision (a) provides that money may be appropriated from the fund for "operating expenses" and certain other expenses not here involved. Subdivisions (b), (c), (d) and (e) provide for appropriations from that fund for certain other specific purposes not here involved, and subdivision (f) provides "for a surplus fund." Section 129 provides that when the surplus fund reaches a certain size a portion thereof shall be transferred to the general fund. The majority opinion, after holding that the purpose here involved is a proper public purpose, holds that, under the power to appropriate money from the fund for "operating expenses," the board has power to appropriate money for the purpose of sending representatives of the commission and of the city and county to Washington to urge the adoption of the measure then under consideration.

The basic theory of the charter is that funds earned by each utility shall be kept in a separate fund, and that no money shall be taken therefrom except for the purposes speci-

fied. The funds of the utility are not to be used to pay the expenses of the city and county generally, nor are such funds to be dissipated because, forsooth, the majority of the board of supervisors decide that the expenditure is reasonably necessary for the protection of the city and county or of the utility. If the phrase "operating expenses" is to be "interpreted" into a general catch-all that will authorize all expenditures deemed necessary by a majority of the board to protect the utility, the entire protection of the utility's funds set up by the charter will be lost.

The precise problem here involved has already been passed upon by the Supreme Court on at least two occasions. In both cases the decisions were adverse to respondents. *Mines v. Del Valle*, 201 Cal. 273 [257 P. 530], is the leading case. That case involved the interpretation of the charter of the city of Los Angeles. That charter conferred upon the board of public service commissioners power "to construct, operate, maintain and extend" power plants; required the funds of the utility to be deposited in the city treasury in a separate fund, and provided that such moneys could be expended, among other things, "For the necessary expense of conducting, operating and maintaining, and extending the business of said department pertaining to electric power, of the electric power works, plants, systems and equipments and of making all current and ordinary extensions, betterments and repairs." The city operated a public utility that supplied electricity to some of its inhabitants, but the plant was too small to supply all the electric energy needed, and a considerable quantity of electric energy was purchased from a competing company. The city council determined to submit to the electors of the city a bond issue for the purpose of securing money to extend the system. The bond issue was contested. The governing board of the utility determined that the opponents of the measure were circulating (p. 278) "misleading, deceptive and untruthful reports against said bonds . . . in the form of circulars, newspaper articles and advertisements." The board thereupon expended from the utility's funds some $12,000 in payment of claims for the cost of advertising the merits of the bond issue in newspapers, and for the cost of cards, banners, windshield stickers, handbills, postal cards, etc. This was done in an attempt to urge the voters to approve the bond issue and to offset what the board believed was the misleading and untruthful reports of

the opponents of the issue. A taxpayer challenged these payments. The defense of the city was that the extension of the electric system was necessary to the best interests of the city; that the opponents were circulating false reports in an attempt to defeat the bond issue; that in order to inform the voters of the merits of the proposal it was necessary to incur the expenditures. The trial court granted the taxpayer judgment on the pleadings, holding that such expenditures from the utility's funds could not be justified under the power to "extend" the system. It was urged that the power to extend the system included the power to do all things reasonably necessary to execute that power. The court held (p. 282) that the "vice of this argument is in assuming that the raising of the necessary funds is any part of the power to extend said electrical system. We may all concede that the system cannot be extended without funds with which to carry on such extension. But the raising of the money to extend said system is one thing and the extension of it is an entirely different and distinct power. The provisions of the charter giving to the board of public service commissioners power to extend the electrical plants and works of said city and to expend the funds in the power fund for the purpose of extending said public utility in our opinion refer simply to the physical management of the same and cannot be enlarged to include another and distinct power, that of raising money either directly or indirectly for the purpose of . . . extending the business" of the utility. The court then held that the expenditures could not be justified by the argument that they were necessary to correct the misinformation disseminated by the opponents of the bond issue. The problem was purely one of construing the provisions of the charter. At page 288 it is stated: "It is sufficient to show that the authority claimed by the board of public service commissioners to make such expenditures was not given to them by any express provisions of the charter, nor can it be implied from any of the terms thereof. This being so, neither said board nor this court nor any other court can invest said board with the authority denied it by the charter, no matter how desirable or necessary it may be made to appear that said board should be invested with such authority."

The other case in which the precise question here involved has been decided adversely to the position taken in the majority opinion is *Mobley* v. *Board of Public Works*, 44

Cal.App. 167 [186 P. 412]. That case involved the old charter of San Francisco under which the board of supervisors were authorized to make appropriations from the receipts of a public utility for the purpose of "extensions and improvements." The city operated a municipal railway system. The board sought to appropriate from the municipal railway fund a sum of money to be expended in investigating the availability of a competing private railway for purchase by the city. The District Court of Appeal affirmed a decision in favor of a taxpayer who had brought an action to enjoin the expenditure. The Supreme Court, in denying a hearing, stated (44 Cal.App. 167 at p. 173) : "Without regard to any other question discussed in the opinion of the district court of appeal, we are satisfied that the charter of San Francisco, as now written, does not authorize the payment of money from the funds of the municipal railway system for the purpose of investigating the condition and availability of a part or the whole of another street railway with a view to its purchase. The purposes for which expenditures from such fund can be made are carefully specified in section 16, article XII, of the charter, which, we think, excludes any such expenditure as here proposed. Such an *investigation* may not fairly be held to constitute an 'extension or improvement' of the municipal system."

These cases are direct and controlling authority on the issue presented in the instant case. In the Mines case, *supra,* the Supreme Court held that power to expend money to extend the utility did not include the power to expend money to induce the electorate to extend the utility by approving a bond issue. In the Mobley case it was held that power to expend money for extensions and improvements did not include the power to expend money for the purpose of investigating the merits of a proposed extension. In our case, the power to expend money for "operating expenses" cannot be interpreted to mean that the board has power to expend the utility's funds to induce the Congress to extend the utility by approving an amendment to the Raker Act so as to permit the utility to extend its system by disposing of its electric energy in a manner then prohibited.

The Mines and Mobley cases, *supra,* constitute binding and conclusive adjudications on the precise point here involved. If the power to extend the system does not include the power to expend money to advocate the extension, or, if the power

to make "extensions and improvements" does not include the power to expend money to investigate the propriety of an extension, how can the power to expend money for "operating expenses" be interpreted to include the power to advocate an extension of the system? It must be remembered that the purpose of the committee was to advocate a specific amendment to the Raker Act by which the utility would be permitted to operate in a manner then prohibited by federal law. That is just as surely an attempt to "extend" the system as would be the purchase of a competing utility. It makes no difference legally that the utility here had already illegally "extended" its system by entering into the prohibited contract. Certainly there can be no difference so far as the question of power is concerned between seeking approval of an extension in the first instance, and seeking ratification of such extension, where the extension was illegal when made, after it becomes a completed fact. The theory of the two cases under discussion was simply that the charter provisions there under consideration did not authorize such expenditures.

The majority opinion apparently holds that there is some distinction between an attempt to convince the voters of the propriety of an extension, and an attempt to convince the Legislature or one of its committees of the propriety of such extension. In the Mines case, *supra*, the desired extension had to be approved by the voters. In the present case approval for the desired extension had to be secured from the Congress. Certainly if expenditures to convince the voters, the repository of legislative power, was improper, expenditures to convince a congressional committee are equally improper.

The majority opinion cites *Crawford* v. *Imperial Irrigation District*, 200 Cal. 318 [253 P. 725], in support of its conclusions, and implies that in some way that case qualifies the holding of the Mines case. All that the Crawford case held was that the employment of persons to influence legislation, in a proper way, is not against public policy, and that there was no limitation in the statutes regulating irrigation districts which prohibited the expenditure of money for this purpose. With that holding I heartily agree. The point is that in the present case the charter prohibits such expenditures from this fund.

The majority place considerable reliance upon the decision

in *O'Connell* v. *City and County of San Francisco,* 204 Cal. 1 [266 P. 1118]. A reading of that opinion discloses that it is not authority for any rule of law. That opinion is five and one-half lines long. It simply holds that the plaintiff's complaint failed to state a cause of action, and that the demurrer thereto was properly sustained. What the complaint alleged is not disclosed, nor are we told why the contents of the undisclosed allegations were not sufficient. That case is not authority for any point of law. (7 Cal.Jur. p. 641, § 46.) The opinion cannot be bolstered by a reference to the record. There were many reasons disclosed in the record why the complaint therein may not have stated a cause of action, and this court is not entitled to engage in conjecture, surmise or guess as to the basis of that opinion. We know that the Supreme Court in that case did not mention the Mines or Mobley cases, *supra,* and we certainly are entitled to believe that that court did not intend, in such cavalier fashion, to overrule those cases.

In my opinion, the record demonstrating that the proposed expenditures are prohibited, the judgment should be reversed.

Appellant's petition for a hearing by the Supreme Court was denied March 6, 1944. Edmonds, J., Carter, J., and Traynor, J., voted for a hearing.