[L. A. No. 8197.   In Bank.—June 1, 1927.]

# W. W. MINES, Respondent, v. R. F. DEL VALLE et al., Appellants.

[1] MUNICIPAL CORPORATIONS—ILLEGAL EXPENDITURES—ACTION TO RE- COVER — PARTIES — TAXPAYER — RESIDENT — PROCEEDINGS.—In an action to recover moneys of a municipality alleged to have been illegally expended, brought against members of the board of public service commissioners, the controller of the public service department, the auditor and the treasurer of the municipality, where the complaint alleges that the plaintiff is a taxpayer, it is not necessary that it allege that he is a resident of the munici- pality.

[2] ID.—DENIAL—FAILURE TO RAISE ISSUES. — In such an action, a denial in the answer of the defendants that they unlawfully approved, allowed, or ordered paid or unlawfully paid any of the claims mentioned in the complaint, and the denial that by rea- son of any of the acts of the defendant set forth in the complaint the burden of taxation has been materially increased upon the property of the plaintiff or upon the property in said city, raise no issue of fact which requires or permits the introduc- tion of evidence to sustain or disprove it.

[3] ID.—EFFECT OF ILLEGAL EXPENDITURES—EXHAUSTION OF FUND.— If money belonging to a city is illegally paid out by its officers, the inevitable result is a detriment to the taxpayers of the city, with a corresponding increase, either directly or indirectly, of the burden of taxation upon the property owners therein; and the fact that the funds unlawfully withdrawn from the public treasury are not raised by direct taxation, but represent receipts from a public utility operated by the city, does not change the result.

[4] ID.—RIGHT OF TAXPAYER.—A taxpayer of a city, when he sees the money of the city being unlawfully applied and paid out for unlawful purposes, is not without right either to stay the illegal expenditures or recover the same on behalf of the city after they are made, simply because he cannot show that he thereby sus- tained some special damage.

[5] ID.—BOND ELECTION—EXPENDITURE OF CITY FUNDS TO INDUCE FAVORABLE RESULT—ILLEGALITY OF.—The power revenue funds of the city of Los Angeles may not lawfully be expended upon publicity, in the form of newspaper ads, circulars, posters, banners, and the like, addressed to the people of the city for

4.   See 18 **Cal. Jur.** 1130.

the purpose of bringing about the approval of a popular bond issue designed to enable the city to enlarge its electric system and extend its electric power business.

[6] ID.—LOS ANGELES CHARTER—CONSTRUCTION—POWER TO EXTEND MUNICIPAL PLANT—RAISING MONEY FOR.—The provisions of the charter of the city of Los Angeles giving to the board of public service commissioners power to extend the electrical plants and works of the city and to expend the power funds for the purpose of extending said public utility, refer simply to the physical management of the same and cannot be enlarged to include another and distinct power, that of raising money, either directly or indirectly, for the purpose of conducting and operating said utility, or for the purpose of extending the business thereof.

[7] ID.—EXTENSION OF PUBLIC UTILITY SYSTEM—BOND ISSUE—AUTHORITY TO PROVIDE FOR.—The Municipal Bond Act (Stats. 1901, p. 27; Deering's General Laws of 1923, p. 1964), gives the right and authority to determine the public interest and necessity which may demand or require an issue of bonds for the purpose of extending the public utility system of a municipality, not to the board of public service commissioners, but to the city council, and the entire proceeding for the issuance of bonds under said section is committed to the control and direction of said city council; but after the proceeds are received and placed in the proper fund they come under the jurisdiction of the board of public service commissioners and are subject to the disposal of said board for the purpose designated in the charter.

[8] ID.—PROPRIETARY POWERS OF CITY—CONSTRUCTION—AUTHORITY OF OFFICERS.—The powers of a city of a proprietary character are given a more liberal construction than those which are strictly governmental in character, but it does not follow that a municipality in exercising powers in its proprietary capacity has the authority to do any act or thing which its officers may think necessary for the proper conduct or maintenance of the business in which it is engaged.

[9] ID. — CONSTRUCTION OF LOS ANGELES CHARTER. — There being nothing in the charter of the city of Los Angeles authorizing the use of power funds for the purpose of carrying a bond election to raise funds for the extension of the power system, the contention cannot be maintained that such expenditures were justified because they were necessary for the purpose of correcting misinformation disseminated among the voters by power companies, operating competing utilities, and others who were opposing the election.

[10] ID.—ILLEGAL PAYMENTS—PUBLIC FUNDS—RIGHT OF RECOVERY—GOOD FAITH OF OFFICERS.—The fact that the money paid out in such a case was paid out honestly and in the belief that it was

8. See 18 Cal. Jur. 802.

within the authority of the board of public service commissioners to use the funds of the city in payment of said expenditures does not prevent a recovery of the money from the defendants.

(1) 28 Cyc., p. 1747, n. 69.   (2) 28 Cyc., p. 1747, n. 76 New. (3) 28 Cyc., p. 1732, n. 96.   (4) 28 Cyc., p. 1732, n. 99.   (5) 28 Cyc., p. 952, n. 57 New.   (6) 28 Cyc., p. 952, n. 57 New.   (7) 28 Cyc., p. 1536, n. 67, p. 1598, n. 51 New.   (8) 43 C. J., p. 194, n. 79 New, p. 197, n. 7 New.   (9) 28 Cyc., p. 1536, n. 67.   (10) 43 C. J., p. 719, n. 77 New.

APPEAL from a judgment of the Superior Court of Los Angeles County. Edward I. Butler, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Jess E. Stephens, City Attorney, W. B. Mathews and James G. Leavy for Appellants.

Carroll Allen and Hunsaker, Britt & Cosgrove for Respondent.

James H. Howard, City Attorney of Pasadena, John J. O'Toole, City Attorney of San Francisco, William Guthrie, City Attorney of San Bernardino, *Amici Curiae*, and Chas. L. Childers and A. C. Finney for Imperial Irrigation District in Support of Appeal.

CURTIS, J.—This action was instituted by plaintiff, a taxpayer of the city of Los Angeles, against certain officers of said city to compel the repayment by said officers into the treasury of said city of certain sums of money which plaintiff alleges were illegally paid out by said officers. The defendants are the members of the board of public service commissioners, the controller of the public service department, the auditor and treasurer, respectively, of the city of Los Angeles. The complaint sets forth that on the fourteenth day of May, 1923, the city council of said city of Los Angeles, by the passage of the resolution provided by law, called an election, at which there was submitted to the the electors of said city the proposition of incurring a bonded indebtedness in the amount of $35,000,000 for the purpose of the acquisition, construction and completion by

said city of certain municipal improvements, to wit, works for supplying the said city and its inhabitants with electric energy for the purpose of light, heat, and power, including the construction and acquisition of works for the development of electric energy and of substations, transmission lines, distributing lines, conduits and other works for transmitting said electric energy, and the acquisition of land, water rights, rights of way, machinery, apparatus and other works and property necessary therefor. It is further alleged in said complaint that after the passage of the resolution submitting said proposition to a vote of the electors of said city, there was filed with the said board of public service commissioners certain claims against said city of Los Angeles for labor performed, materials furnished, and services rendered said municipality and said department of public service, which claims were audited and approved by said board of public service commissioners and by the said controller of said public service department, and thereafter audited and approved by the auditor of said city, after which they were paid by the treasurer of said city out of the public funds of said city then in said city treasury. The complaint, and the amendment thereto subsequently filed (we will hereafter refer to both pleadings as the complaint), set forth that twenty-two of such claims were presented to said board and by said board, said controller, and said auditor, audited and approved, and thereafter paid by said treasurer from the funds of said municipality; that the aggregate amount of these claims was the sum of $12,415.15. These several claims are separately set forth in twenty-two separate counts, and in the main were for printing cards, banners, automobile windshield stickers, automobile banners, labels, circulars, handbills, dodgers, and postal cards; for distributing and circulating the same; for constructing a float; and for advertising in certain newspapers in said city; that all of the labor performed, the materials furnished and the services rendered, which were the basis of said claims, were performed, furnished, and rendered to the said department of public service between the date of the resolution of said council calling said election and the date of said election, and that said department of public service purchased said cards, banners, and other materials and used the same and paid for the circulation thereof and caused

said advertising to be inserted in said newspapers for the purpose and with the intent of influencing the electors of said municipality to vote in favor of said bond issue. A further allegation of said complaint sets forth that plaintiff had notified said department and the said treasurer of said city after the auditing of each of said claims, and prior to its payment, that the same was an illegal charge against said city, and in the event it was paid by said treasurer plaintiff would institute proceedings in court to compel the repayment thereof; furthermore, that after the payment of said several claims as aforesaid plaintiff filed with the city council of said city a written request and demand that said city institute proceedings against said defendants to recover from them, and to require them to pay into the city treasury the sums of money paid out upon said claims, but that said city council had denied said request and demand and refused to institute any action to recover said sums of money or any of them or any part thereof. The complaint also contains an allegation that plaintiff is the owner of property situated in said city, and that by reason of the acts of defendants in paying out said sums of money the burden of taxation will be materially increased upon his land and property within said city and upon the lands and property of other taxpayers in said municipality.

The defendants jointly answered said complaint and denied that they had unlawfully approved, allowed, or ordered paid any claim against said city or had unlawfully paid out of the treasury of said city any funds of said city upon any claim mentioned in said complaint. They also denied that by reason of any action on their part as alleged in said complaint the burden of taxation had been or would be materially or otherwise increased on the lands or property of plaintiff located in said city or upon any of the lands or property of the taxpayers therein. As a special defense defendants set up in their answer that the city of Los Angeles was then, and for more than five years prior thereto had been, the owner of, through the department of public service, of which the board of public service commissioners had charge and control, and during said time, through said department, had been and was then engaged in the business of operating, a system consisting of works and plants located inside and outside of said city for the generation of hydroelectric energy, lines

for the transmission of such energy to and into said city and lines and conduits and other structures and appliances for the delivery and distribution thereof to said city for the lighting of municipal public buildings, streets, and other public places in said city and to its inhabitants for the purpose of heat, light, and power; that owing to the rapid and continued growth of said city the plants and works had become and were then insufficient to meet the demand of its customers, and by reason thereof said city had been and was then compelled to purchase large and increasing amounts of electric energy at prices at least twice as great as the cost of the same would be if produced at plants built and operated by it; that the proposed bond issue of $35,-000,000 was for the purpose of providing funds with which to purchase and acquire property and construct works for the generation of additional electric energy and for the extension of the municipal distributing system of said city in order to supply the needs of said city and of its inhabitants for additional electric energy; that the territorial extent of said city exceeded 350 square miles, its population had increased from 576,673, the number determined by the federal census in 1920, to approximately 900,000 at the time of said election, and there were within said city 851 election precincts and 272,848 registered voters entitled to vote at said election; that the proposition to create said bonded indebtedness and to issue said bonds was sharply contested, "some of the newspapers and some civic organizations of said city favored and some opposed the voting of said bonds, literature opposing said bonds was distributed or conspicuously posted throughout said city, speakers and workers acting in behalf of electric power companies operating in said city opposed the voting of said bonds, and large quantities of public printed matter containing misleading, deceptive and untruthful reports against said bonds were circulated in the form of circulars, newspaper articles and advertisements among the voters of said city"; that by reason of the foregoing conditions "it was necessary for the said board of public service commissioners, in order as far as practicable that the voters of said city might be informed of the pendency of said power bond proposition and correctly understand the objects and purposes of said proposed bonds and the benefits and advantages to accrue from author-

izing the same to said city and its inhabitants and in order to stimulate their interest in such proposition and cause them to go to the polls and vote thereon to'' incur the indebtedness represented by said claims and which were paid by the authorization of said board of public service commissioners from the funds belonging to said city. After the filing of the answer the plaintiff moved the court for judgment upon the pleadings, which motion was granted by the trial court and judgment was accordingly rendered against the defendants for the aggregate amount of said claims in favor of said city of Los Angeles and in favor of plaintiff for his costs. From this judgment the defendants have appealed.

[1] At the outset, appellants contend that the judgment against them cannot stand, for the reason that the complaint, while alleging that respondent is a taxpayer, fails to show that he is a resident of the city of Los Angeles, and that an action of this character can only be maintained by a citizen and resident of the municipality in whose behalf the same is prosecuted. Appellants cite section 526a of the Code of Civil Procedure in support of this contention. This court has expressly ruled to the contrary (*Osburn* v. *Stone,* 170 Cal. 480, 482 [150 Pac. 367]; see, also, *Crowe* v. *Boyle,* 184 Cal. 117, 152 [193 Pac. 111]).

[2] The next ground advanced by appellants for a reversal of the judgment is that as the answer contains denials putting in issue material allegations of the complaint, it was error on the part of the trial court to grant respondent's motion for judgment on the pleadings. The only denials in appellants' answer are (1) they deny that they unlawfully approved, allowed, or ordered paid or unlawfully paid any of the claims mentioned in the complaint, and (2) they deny that by reason of any of the acts of appellants set forth in said complaint the burden of taxation has been materially increased upon the property of respondent or upon any property in said city. As to the first of these denials we do not understand that appellants claim that it raises any issue of fact which requires or permits the introduction of evidence to sustain or disprove it. The other of the two denials of the answer likewise raises no issue of fact. [3] If money belonging to the city is illegally paid out by its officers, the inevitable result

would be a detriment to the taxpayers of said city, with a corresponding increase, either directly or indirectly, of the burden of taxation upon the property owners therein. The fact that the funds unlawfully withdrawn from the public treasury were not raised by direct taxation, but represented receipts from a public utility operated by the city, would not change this result. This is particularly so in the present instance by virtue of the provisions of the charter of said city relative to funds received as revenues of said city from the operation of its electric power plant. Besides, we think it doubtful whether the allegation of the complaint to which this denial was directed was necessary in an action of this character. [4] Must a taxpayer, when he sees the money of the city being unlawfully applied and paid out for unlawful purposes, sit idly by, and is he without right either to stay the illegal expenditures or recover the same on behalf of the city after they are made, simply because he cannot show that he thereby sustained some special damage? This court has repeatedly held that he is not so · helpless (*Crowe* v. *Boyle*, 184 Cal. 117 [193 Pac. 111], and citations found on page 152 thereof). The denials of the answer, therefore, raise no issue of fact and the judgment upon the pleadings must be affirmed, unless the special defense set up in the answer constitutes a legal defense to respondent's action. This brings us to the real question presented on this appeal, that is, the legality of the expenditures incurred by the board of public service commissioners in carrying on a campaign in favor of the proposed bond issue.

[5] This question is fairly and comprehensively stated by appellants as follows: "The main, practical question, on the present controversy, is, whether the power revenue funds of the city may lawfully be expended upon publicity, in the form of newspaper ads, circulars, posters, banners and the like, addressed to the people of the city for the purpose of bringing about the approval of a popular bond issue designed to enable the city to enlarge its electric system and extend its electric power business."

The city of Los Angeles at the time this controversy arose, and for some time prior thereto, was governed by a charter regularly adopted by the electors of said city and

approved by the legislature. Section 192 (g) of said charter provided in part that:

"The Board of Public Service Commissioners shall have power:

"To manage and control . . . all electric plants, works, systems and equipments, and all electric power belonging to the city.

"To construct, operate, maintain and extend . . . electric plants, works, systems and equipments, and other means for supplying the city and its inhabitants with electricity for light, power, heat and other purposes; . . . "

Section 192 (h) of said charter empowers the board: "To control and order the expenditure of all moneys received from the sale or use of electric power, or otherwise in connection with the operation and management of the electric power works and systems of said city; provided, that all such moneys shall be deposited in the treasury of the city, to the credit of a fund to be known as the 'Power Revenue Fund'; . . . " By the same section it is provided that: " . . . none of the money in said Power Revenue Fund, or coming under the control of said board in connection with the operation of electric power plants, works or systems of the city, shall be appropriated or used for any purpose or purposes other than the following, to-wit: . . . For the necessary expense of conducting, operating and maintaining and extending the business of said department pertaining to electric power, of the electric power works, plants, systems and equipments and of making all current and ordinary extensions, betterments and repairs." A further provision of the charter, subdivision 50 of section 2, it is claimed by appellants, has some bearing upon the solution of the question in controversy. This provision reads as follows: "The city of Los Angeles shall have and it is hereby given and it hereby reserves unto itself, and the people of the city hereby reserve unto it, and the people of the state of California hereby grant unto it, and said city may hereafter exercise each and every of the powers which a municipal corporation might or could exercise under the constitution of the state of California; . . . " Under these provisions of the charter the appellants contend that the board of public service commissioners, in the management and operation of the city's electrical utilities and in the expenditures

of the revenues derived therefrom, is invested with as full and complete powers as are enjoyed by a board of directors of a private corporation operating a public utility.

The specific language relied upon by appellants in support of this claim and in justification of said expenditure by said board of public service commissioners is that found in section 192(g) of the charter whereby said board is given the power to manage and control all electric plants and works belonging to the city, and "To construct, operate, maintain and extend . . . electric plants, works, systems and equipments, . . . " and by section 192(h) of the charter whereby said board is empowered to expend and use money in the power revenue fund for the purpose of "conducting, operating and maintaining and extending the business of said department pertaining to electric power," and particularly upon the words "extend electric plants, works," etc., and "extending the business of said department." It is argued by appellants that as the charter expressly gives to said board the authority to extend the electrical plants and works under its charge, it is thereby given implied power to do all acts and things necessary to execute the power expressly given. The right to extend said system being expressly given, appellants contend that one of the necessary steps in the extension of said system is providing the funds with which to make said extension and as it is admitted the funds necessary for this purpose could only be raised by means of a bond issue, that said board was authorized to expend a reasonable amount of said funds to insure the success of said bond issue. The vice of this argument is in assuming that the raising of the necessary funds is any part of the power to extend said electrical system. We may all concede that the system cannot be extended without funds with which to carry on such extension. But the raising of the money to extend said system is one thing and the extension of it is an entirely different and distinct power. [6] The provisions of the charter giving to the board of public service commissioners power to extend the electrical plants and works of said city and to expend the funds in the power fund for the purpose of extending said public utility in our opinion refer simply to the physical management of the same and cannot be enlarged to include another and distinct power,

that of raising money either directly or indirectly for the purpose of conducting and operating said utility, or for the purpose of extending the business thereof. [7] The Municipal Bond Act (Stats. 1901, p. 27; Deering's General Laws of 1923, p. 1964), under which said election was held, gives the right and authority to determine the public interest and necessity which may demand or require an issue of bonds for the purpose of extending said public utility system, not to said board of public service commissioners, but to the city council of said city, and the entire proceeding for the issuance of bonds under said statute is committed to the control and direction of the said city council. After the funds are received and placed in said fund they then come under the jurisdiction of said board of public service commissioners and are subject to the disposal of said board for the purpose designated in the charter.

Our attention has been directed to the recent case of *In re East Bay etc. Water Bonds of 1925*, decided by this court and reported in 196 Cal. 725 [239 Pac. 38], in which there is to be found language to the effect that the ordinary newspaper notice is ineffective in notifying the electors of a city of an approaching bond election. Conceding this to be true, we do not understand that appellants are before this court simply contending that the expense incurred and paid out by them was for giving notice to the voters of said city of the approaching election. It is alleged in the complaint, and not denied by appellants, that said funds were used for the purpose and with the intent of influencing the voters of said city to vote in favor of said bond issue. In addition to the pleadings, appellants in their brief state that the practical question presented by this controversy is whether the power funds of the city may be lawfully expended for the purpose of bringing about the approval of a bond issue. We apprehend that if the only payments made by appellants in connection with said bond campaign had been those which were incurred in giving what might be termed public notice of said election in addition to that provided by statute, this proceeding would not be before us, although we seriously question whether said board would have the power to extend the funds in the power fund for such purpose. But, be that as it may, the pleadings in this proceeding, as well as the admission of counsel for

appellants, indicate without question that the appellants caused said funds to be paid from the public treasury for the purpose of inducing the electors of said city to vote in favor of said bond issue. Under this situation what was said by this court in *In re East Bay etc. Water Bonds of 1925, supra,* can have no application to any issue in the present controversy.

As we have already observed, the sole reliance of appellants in so far as the charter is concerned, is upon the words "extend" and "extending," used in said sections 192(g) and 192(h). The word "extension" in an action almost precisely the same as that in which the words "extend" and "extending" are used in said sections of the charter of Los Angeles, has been the subject of judicial consideration by this court. By the charter of the city and county of San Francisco (sec. 16, art. XII), the board of supervisors are authorized to make appropriations from receipts of any public utility operated by said city for the purpose of "extensions and improvements." Said city was operating a municipal railway system. Under this provision of the charter the board of supervisors passed an ordinance whereby it sought to appropriate a sum of money from the receipts of said municipal railway for the purpose of investigating the condition and availability of a privately owned railway system operated in said city, with a view of purchasing the whole or a part of said private system. A taxpayer of the city brought an action to enjoin the expenditure of the money so appropriated. The trial court gave judgment in favor of the plaintiff and on appeal said judgment was affirmed by the district court of appeal. A petition to hear said cause in the supreme court was denied and in denying the same this court said: "Without regard to any other question discussed in the opinion of the district court of appeal, we are satisfied that the charter of San Francisco, as now written, does not authorize the payment of money from the funds of the municipal railway system for the purpose of investigating the condition and availability of a part or the whole of another street railway with a view to its purchase. The purposes for which expenditures from such fund can be made are carefully specified in section 16, article XII, of the charter, which, we think, excludes any such expenditure as here proposed. Such an

*investigation* may not fairly be held to constitute an 'extension or improvement' of the municipal system." (*Mobley* v. *Board of Public Works*, 44 Cal. App. 167, 173, 174 [186 Pac. 412].)

If the power to expend the public funds of the city for the purpose of extending a public utility operated by said city cannot be used by the board in charge of said public utility for the purpose of investigating a privately owned utility with a view of purchasing the latter, surely the power could not be claimed for said board to expend such public money in an endeavor to induce the electors of said city to vote in favor of a bond issue, the proceeds of which were to be used to extend the public utility system under its charge. The last case referred to presents a situation so similar to that involved in the present controversy that we regard it as practically conclusive of the question involved in the present proceeding.

Aside from any provision of the city charter or of the statute authorizing the bond issue, appellants contend as the city is operating, not in its governmental, but in its proprietary character, a municipal system whereby it supplies to its inhabitants electricity for light, power, heat, and other purposes, that it has all the powers of a private corporation engaged in like business. This assertion is supported by a formidable array of authorities from the various courts of this country, including our own, as well as extracts from leading text-writers upon the subject. But in all this array of authority appellants have not presented a single adjudicated case or a line from any text-writer which goes to the extent to which appellants are asking this court to go in holding legal the expenditures made by them from the public funds of said city. [8] That the powers of a city of a proprietary character are given a more liberal construction than those which are strictly governmental in character is settled beyond controversy by the decisions of our courts, and this rule is approved by our best text-writers. But, conceding this to be true, it does not follow that a municipality in exercising its powers in its proprietary capacity has the authority to do any act or thing which its officers may think necessary for the proper conduct or maintenance of the business in which it is engaged. Among the cases cited by appellants in support of their last contention is

the case of *Miller* v. *City of Los Angeles,* 185 Cal. 440 [197 Pac. 342]. In that case this court held that the city of Los Angeles under the provisions of its charter giving it power to acquire by purchase or otherwise any and all property necessary or convenient to furnish the city and its inhabitants with light, heat, and power, had the authority to enter into a lease with a private corporation to furnish to said city electric energy to be used by it in supplying the needs of its consumers. It was contended by the appellant in said action that this charter provision gave to the city the power to acquire by purchase or otherwise the necessary works and plant for the production of electric energy, but not authority to purchase or acquire the manufactured article. This court ruled against said contention and upheld the lease entered into by the city. Another case relied upon by appellants is the case of *Andrews* v. *City of South Haven,* 187 Mich. 294 [Ann. Cas. 1918B, 100, L. R. A. 1916A, 908, 153 N. W. 827]. The city of South Haven was empowered to operate an electric plant for supplying its inhabitants with electricity. In connection therewith it sought to carry on the business of selling and installing electrical fixtures. A taxpayer of said city brought an action to enjoin it from engaging in the business of selling and installing electric fixtures. The supreme court of Michigan held that "furnishing to customers taking electricity the necessary devices or equipment to produce heat, power, or light from the (electrical) current is naturally incidental to and an implied power connected with the business of operating an electric light plant." These two cases probably go as far as any of the authorities cited by appellants in supporting their contention that a liberal construction should be given to statutes or charter provisions conferring powers upon municipalities engaged in what might be termed business ventures as distinguished from their governmental functions. It would be an unreasonable and unwarranted extension of the principle enunciated in these and similar cases, because in the instances considered therein the several municipalities were found to be acting within the scope of their authority, to hold that a city or one of its governmental boards authorized to maintain, conduct, and extend a public utility, could use the funds with which it is entrusted for the purpose of conducting said public utility, for an en-

tirely different and distinct purpose—that of carrying on a campaign for the purpose of influencing the voters of said city in favor of a bond issue.

The pleadings herein, as well as the result of the election, show that the sentiment existing among the electors of said city as to the advisability of issuing said bonds was divided. While the proposition to issue bonds received a majority of the votes cast at the election it did not receive a two-thirds favorable vote as required by the statute in order that the bonds might be issued. It must be conceded that the electors of said city opposing said bond issue had an equal right to and interest in the funds in said power fund as those who favored said bonds. To use said public funds to advocate the adoption of a proposition which was opposed by a large number of said electors would be manifestly unfair and unjust to the rights of said last-named electors and the action of the board of public service commissioners in so doing cannot be sustained unless the power to do so is given to said board in clear and unmistakable language. [9] As already stated, we find nothing either in the charter of the city or in any statutory enactment or otherwise which confers such authority upon said board of public service commissioners. Appellants allege that the power companies, operating competing utilities in said city, formed a large part of the opposition to said bond issue and that these power companies employed workers and speakers to oppose said bonds; furthermore, that large quantities of printed matter containing misleading, deceptive and untruthful reports against said bond issue were disseminated among the voters of said city. Appellants therefore seek to justify the expenditures complained of herein by asserting that the same were necessary in view of and for the purpose of correcting the misinformation disseminated among the voters of said city. The possibility that these conditions might arise might well have been considered by the framers of the charter when defining and limiting the powers of the board of public service commissioners of said city and provisions might have been made therein to meet such conditions. But, whether considered or not, it is apparent to us that the framers of said charter have made no such provision. Therefore, these matters can have no controlling effect upon the court when endeavoring to

construe the terms of said charter. It is sufficient to show that the authority claimed by the board of public service commissioners to make such expenditures was not given to them by any express provisions of the charter, nor can it be implied from any of the terms thereof. This being so, neither said board nor this court nor any other court can invest said board with the authority denied it by the charter, no matter how desirable or necessary it may be made to appear that said board should be invested with such authority.

[10] Finally, appellants contend that as the money was paid out honestly and in the belief that it was within the authority of the board of public service commissioners to use the funds of the city in payment of said expenditures, no recovery can be had against appellants. In support of this contention they cite the case of *Osburn* v. *Stone, supra,* and direct attention to the following language of this court used therein: "it is proper in closing this discussion to say that the trial court will recognize the discretion which in many matters is and of necessity must be vested in public officials, and will recognize, moreover, that for an honest, even though mistaken, exercise of discretionary powers, no public officer is responsible." There can be no question of the good faith and honest intention of the appellants. There is not the faintest suggestion that any of them acted in this matter with any other motive than a desire to faithfully and honestly execute the duties of their respective offices and to perserve and protect the public trust committed to them by the people of said city. While this court approved the rule set forth in the above quotation from the case of *Osburn* v. *Stone, supra,* yet in the same decision is to be found the following language: "The converse of the argument is that the powers of municipal officers are well defined. Their modes of procedure in all matters of expenditure are pointed out with particularity. They are given by law a legal adviser, and, if not, are fully empowered to employ one. There is no occasion whatsoever for their taking any step without such advice. There is no reason for their ever making any illegal expenditure of the public's moneys. To countenance the making by these officials of an illegal expenditure in one case is to open wide the door for like expenditures in every case." In

that case, which was an action brought by a taxpayer against the mayor and common council to recover from them money illegally paid out of the public treasury, it was held that nine out of the ten counts of the complaint stated good causes of action against said defendants for the recovery of money so illegally paid out by them. What was meant, in fact what was said, by the above quoted language from *Osburn* v. *Stone*, was that public officials are vested with certain discretion in the execution of their duties and that they cannot be held responsible for an honest, even though it be a mistaken, exercise of their discretionary powers. Nothing can be found in that decision, or for that matter in any other of which we have any knowledge, which would justify the attempted exercise by an official of any power or authority not expressly or impliedly given to him, no matter how honest may be his intention or how upright his motives.

In a very recent case decided by us during the present month (*Mahoney* v. *City and County of San Francisco et al., ante*, p. 248 [257 Pac. 49]), we held that under the complaint therein the auditor and treasurer of the city and county of San Francisco were liable for the repayment of moneys approved and paid out by them upon a contract entered into by the board of supervisors of said municipality, and which was beyond the powers of said board to make. There was no question of the good faith and honesty of intention of said officers in auditing and paying out said money, but as the contract under which it was expended was not within the powers of the board, its payment was illegal and said officers were held liable for its repayment.

The case of *Osburn* v. *Stone, supra,* in so far as the legal principles therein decided, bears a striking similarity to the present action. The sum and substance of that decision is that public funds illegally or unlawfully paid out by a public official can upon a suit by a taxpayer be recovered and the officer or officers responsible for said illegal or unlawful payment compelled to repay the same into the treasury of said city. Such in all its essential features is the present proceeding as presented by the complaint and answer thereto. The complaint under the authority of *Osburn* v. *Stone, supra,* states a good cause of action against ap-

201 Cal.—19

pellants and the answer thereto by appellants fails to state any legal defense to said cause of action. It was not error, therefore, for the trial court to grant the motion for judgment on the pleadings and the judgment entered in accordance with the order granting said motion is valid and binding upon the appellants.

The judgment is affirmed.

Richards, J., Preston, J., Seawell, J., Langdon, J., and Waste, C. J., concurred.

Rehearing denied.

Shenk J., and Langdon, J., dissented.