THE CITY AFFAIRS COMMITTEE OF JERSEY CITY, A CORPORATION OF NEW JERSEY, PROSECUTOR, v. THE BOARD OF COMMISSIONERS OF THE CITY OF JERSEY CITY AND THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, DEFENDANTS.

Argued January 16, 1945—Decided March 28, 1945.

Before Justices CASE, BODINE and PORTER.

For the prosecutor, *Leo Rosenblum.*

For the defendants, *Charles A. Rooney (Charles Hershen-stein,* of counsel).

The opinion of the court was delivered by

PORTER, J. At a meeting of the defendant Board of Commissioners of the City of Jersey City held on October 3d, 1944, a resolution was adopted setting forth reasons why, in the Board's opinion, the proposed new state constitution would be detrimental to the best interests of the city. It provided for public advertisements in which the Board's views were to be publicized for the purpose of defeating the ratification of the constitution at the November 7th election. The legality of this resolution is before us on *certiorari.* Its text is as follows:

"WHEREAS, as a result of the decision of the New Jersey Court of Errors and Appeals affirming the decision of the Court of Chancery of New Jersey, declaring unconstitutional the railroad settlement bills which so vitally affect the municipality of Jersey City, in which litigation the city's interest amounted to approximately $20,000,000, and there still remain many millions of dollars unpaid to the City of Jersey City; and

"WHEREAS, there is located in the City of Jersey City a vast amount of railroad property, including valuable waterfront property, and the payment of the just and fair share of taxation on that property seriously affects the finances of the city, and the general well-being and welfare of the people of Jersey City; and

"WHEREAS, the railroads have been urging upon the courts for years that their property should be assessed in accordance with standards of value and not in accordance with 'true value' as assessed by the taxing authorities, but have been unsuccessful in their efforts by reason of the adverse decisions rendered by our courts; and

"WHEREAS, a proposed revised Constitution is to be voted on by the people of this state at the general election to be held in November, 1944, which said proposed Constitution

modifies the existing Constitution so as to enable the railroads to accomplish enormous tax discriminations and preferences which they have been striving to obtain for years, without success, by reason of the present constitutional provision which provides that all property, including railroad property, must be assessed at true value and in no other way; and

"WHEREAS, it is imperative that the people of the entire state, upon whom depends the adoption or rejection of this Constitution, should be apprised of the seriousness of the situation which confronts the people and which so vitally affects the interest and welfare of Jersey City; and

"WHEREAS, the best method of making known to the people of this state the importance of this matter is through paid, wide publicity throughout the state.

"Now, THEREFORE, BE IT RESOLVED, that the city, through its Mayor, is hereby authorized to publicize and advertise all of the facts relating to this matter and the advantages resulting to Jersey City, from a defeat of the proposed revised Constitution and the importance of the matter to the welfare of its people, and to take all and every means available to make known to the people of New Jersey the dangers lurking in the proposed revised Constitution, and so prevent the loss of millions of dollars in railroad taxes to the City of Jersey City; and

"BE IT FURTHER RESOLVED, that the money to be expended for this publicity and advertising be charged against Account No. 225, wherein appropriation has been made for railroad tax litigation."

This resolution was adopted after the Board had received an opinion by counsel of his views as to the effect the new constitution would have on the affairs of the city. It was his opinion that the proposed constitution, if adopted, would result in at least two specific changes in the basic law. (1) It would permit the legislature to select any separately classified type of property and tax it *ad valorem* at less than its true value. (2) It would permit the legislature to select such class of property and exempt it outright even though it were devoted to private commercial uses. Counsel further advised

the Board that the effect of the adoption of the proposed constitution would be to destroy the legal basis for attack then pending in this court against legislation fixing the railroad tax rate by the Railroad Tax Law of 1941 (*Pamph. L., ch. 291*), as amended in 1942 (chapter 169).

A large part of the revenue of the City is derived from taxes on railroad property, and it appears that the Board of Commissioners were fearful that if the proposed constitution were adopted, it would very seriously decrease the amount of taxes which the city would receive and that the adoption of the constitution would therefore be inimical to the best interest of the city and against the public good. The publication of newspaper advertisements setting forth its views and arguments against the adoption of the constitution followed. Expenditures of about $30,000 for that purpose were incurred.

Two meritorious questions are presented; first, whether it was lawful for the Board to expend public funds in presenting its views to the public by newspaper advertisements in advocating the defeat of the proposal by the voters; and second, if so, whether funds had been adequately appropriated in the budget for the payment of the expenses incurred.

We think municipalities may, within their discretion and in good faith, present their views for or against proposed legislation or referendum to the people of questions which in their judgment would adversely affect the interests of their residents. To accomplish this purpose we think they may incur expenditures by the publication of pamphlets, circulars, newspaper advertisements or radio addresses and that to do so is a proper governmental function. This court so held recently in the case of *In re Carrick*, 127 *N. J. L.* 316, which in principle we cannot distinguish from the instant case, and which ruling is therefore binding on this court. If the language of the advertisements contains libelous statements, as claimed by prosecutor, the law provides a remedy, but it is not by *certiorari*. It is not the court's function to control the form of public expression. *In re Carrick, supra.*

It appears that the city had included in its budget an appropriation against which these expenditures were charged,

designated as Account No. 225 which was made for "railroad tax litigation." It further appears that for a period of several years the city has been engaged in litigation in this state concerning railroad taxes and that heretofore in connection with that litigation it has incurred expenditures which have been paid out of funds similarly appropriated. It is argued that no proper appropriation has been made for the payment of these expenses and that same cannot be paid out of this appropriation because it is not railroad tax litigation. While it is true that these advertisements are not directed specifically to the litigation, nevertheless we think they are sufficiently germane to the general purpose of the appropriation to properly include it.

The writ will be dismissed, with costs.

Mr. Justice Bodine concurs. Mr. Justice Case dissents.

CASE, J. (Dissenting.)' The resolution under review, adopted by the Board of Commissioners of Jersey City on October 3d, 1944, authorized the questioned advertisements and directed that the cost "be charged against Account No. 225, wherein appropriation has been made for railroad tax litigation."

Two sets of full page newspaper advertisements were widely publicized throughout the state, one in October, 1944, and the other in November, 1944, at a total expense of over $30,000. The October insertions were before the allowance of the writ; the November insertions and the payment of the entire cost, thereafter. $2,302.08 of the cost had not been paid when the return to the writ was filed. The matter of the advertisements was submitted to and approved by the commissioners and should be considered as a part of the resolution.

The spirit and content of the advertisements are reflected in the following excerpts:

"Mayor Hague exposes * * * another gigantic steal involving hundreds of millions of dollars of railroad tax moneys in the new proposed constitution to be voted upon Election Day. You will recall that I exposed the handing over of $66,000,000 of the people's money to the railroads by

the Republican Legislature. The courts sustained my position. * * * The same powerful and corrupt influences responsible for this steal are back again, trying to defraud the people, this time by a new constitution in which they destroy the present 'true value' provision under which railroad property is taxed and substitute a provision that railroad property shall be taxed according to 'standard of value' fixed by the Legislature. This will enable the railroads to obtain hundreds of millions of dollars in tax preferences and exemptions, should the new proposed constitution be adopted. * * * Article III, Section 6, Paragraph 8(3) * * * gives the Legislature the specific power to constitutionally tax all railroad property as it sees fit and goes so far as to authorize the Legislature to exempt railroad property entirely from taxation. Remember, it was the same Legislature which is now proposing this 'constitution that made the illegal gift of $66,000,000 to the railroads. Can you imagine what this Legislature will do if given the 'green light' to reduce or exempt railroad property entirely from taxation, with the record which the Legislature has already established? * * * Do the railroads stop with the destruction of the 'true value' clause and the insertion of a new clause deliberately designed to benefit them? NO! To make perfect their plan, they want possession of our highest court, which has for the past twenty years fearlessly and courageously decided over $200,000,000 in railroad tax litigation against the railroads. This very court last May decided the $66,000,000 tax victory against the railroads and in favor of the people. That is exactly what this new constitution does. It abolishes the highest court of our state and replaces it with a hand-picked railroad-dominated court. * * * You have been betrayed once and you will be betrayed again. '* * * This Legislature chose this time, when we are at war, for this referendum. Why could not the Republican leaders have waited until over 600,000 men and women in the service of their country returned, to give them an opportunity to participate in the presentation of the most important document under which they and all of us must live? * * * Vote no and rid the State Government of railroad domination and control.' "

The October advertisements were as above described. The November advertisements were the same except that the word "railroad-dominated" was omitted from the expression "a hand-picked railroad-dominated court."

Article III, section VI, paragraph 8(3), referred to in the advertisement as going so far as to authorize the legislature to exempt railroad property entirely from taxation, actually provided as follows: "The legislature shall not pass any private, special or local laws: * * * Relating to taxation or exemption therefrom except as expressly provided in 'this Constitution." Article VII, paragraph 4, provided: "Property shall be assessed for taxes under general laws, and by uniform rules, according to standards of value as may be provided by law but not in excess of true value; but exemption from taxation may be granted by law to persons who have been, are, shall be, or shall have been in active service in any branch of the military or naval forces of the United States in time of war;" against which is the provision in our present constitution, article IV, section VII, paragraph 12, as follows: "Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value." It will be observed that the proposed constitutional provision regarding assessment for taxes according to standards of value (as against the existing provision "according to its true value") was applicable to all property, not merely railroad property; that the assessments were required to be made under general laws and by uniform rules, as heretofore, and that there was no authority to exempt railroad property from taxation.

The so-called steal of $66,000,000 is apparently an exaggerated reference to the amount of $24,000,000 interest moneys which chapter 290, *Pamph. L.* 1941, and chapter 241, *Pamph. L.* 1942, authorized to be waived on certain conditions, including the requirement that the principal amount of delinquent railroad taxes be paid; legislation that was subsequently held unconstitutional upon the ground that the interest, when it accrued, became a part of the debt and could not be remitted. *Wilentz* v. *Hendrickson,* 135 *N. J. Eq.* 244. The legislature of 1944, which, under command of the popular

referendum, framed the proposed constitution was obviously not the legislature which enacted either the 1941 or the 1942 statute. It is common knowledge that the mandate to the legislature to agree upon a revised constitution and to submit the same to the people for their approval at the 1944 general election—while the country was at war—came from the people themselves at the general election held in November of 1943. The statement that as an exact result of the adoption of the proposed constitution the present court of last resort would be replaced with a hand-picked railroad-dominated court clearly did not come within the realm of fact. It seems to have been inspired by the provision that the proposed court of last resort, to supplant the present court of sixteen members, would initially consist of seven members to be appointed by the governor, with the advice and consent of the senate, from the Chancellor, the Chief Justice and Associate Justices of the Supreme Court, such judges of the Court of Errors and Appeals as are attorneys-at-law of ten years standing, the Vice-Chancellors and the Circuit Court Judges.

There are two major questions: (1) Assuming that the city had statutory authority to engage in such an advertising program, could it lawfully direct that the cost be paid from an appropriation for railroad tax litigation? (2) Did the city have legislative authority to undertake such an advertising program or to authorize an appropriation to meet the expense thereof?

The publication was not a statement of facts relating to Jersey City. It was a political harangue in which truths were mingled with half-truths and untruths, partisan slurs were thrown against an opposite political party and defamatory accusations and innuendos were cast upon persons whose views concerning a debatable governmental proposal differed from those advocated by the sponsors of the advertisement. The text and the theme, in the words of the publication, were that the signer was exposing a gigantic steal about to be accomplished by powerful and corrupt influences and that the people would be betrayed; and a corollary, either by direct assertion or necessary inference, was that the legislature was and would be and, in the event of adoption, that the

governor and the courts also would be, parties to the theft and betrayal.

The commission was without authority to incur that publication expense or any other indebtedness without a pertinent appropriation. *R. S.* 40:2–29; *R. S.* 40:2–31. The questioned resolution sought to charge the advertising expense against an appropriation for "railroad tax litigation." That appropriation, however, was not made with the present disbursement in mind, and the question of the adoption, *vel non,* of an entirely new state constitution does not come within the classification of "litigation." Litigation is described in *Corpus Juris* as being "a contest in a court of justice, for the purpose of enforcing a right; a judicial contest; a judicial controversy; a suit at law; the act or process of litigation." That gives the popular as well as the technical conception of the word. A resolution which is not within the purpose of the appropriation item against which it is allocated is unlawful and will be set aside. *Loudenslager* v. *Atlantic City,* 80 *N. J. L.* 658; *affirmed,* 82 *Id.* 530. The amount to be appropriated for each purpose should be stated, the appropriations itemized and the several items set forth accurately according to the respective and particular objects. *Mackey* v. *Mayor and Common Council of Belvidere,* 101 *Id.* 250. The proposed constitution had been approved in final form on April 11th, 1944, for submission to the people at the November election. (Chapter 92, *Pamph. L.* 1944.) There was, therefore, ample time for the city to have adopted a special emergency appropriation (*R. S.* 40:2–31) if the purpose was lawful and the need had not been foreseen when the budget was adopted. There was no occasion for resorting to an inapt budget item.

My opinion is that the resolution under review was not within the purpose of the appropriation item against which it was allocated and that, therefore, the resolution was unlawful.

But if, as I further believe, the city had no authority to advertise in such fashion or to incur indebtedness in that respect, the resolution was invalid even though we assume that there was colorable similarity between the purpose for

which the appropriation was originally made and that to which it was applied.

The law is thus generally stated by Dillon:

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. * * *." 1 *Dillon's Municipal Corporations* (5th ed.), § 237.

That statement in so far as is here pertinent has ample support in our decisions.

"A municipal corporation is the creature of the legislature, and possesses only such rights and powers (a) as have been granted in express terms; (b) as arise by necessary or fair implication, or are incident to the powers expressly conferred, and (c) as are essential to the declared objects and purposes of the municipality—not merely convenient, but indispensable. It has no inherent jurisdiction to make laws or adopt regulations of government; it is a government of enumerated powers, acting by a delegated authority. Any reasonable or fair doubt of the existence of the asserted power, or any ambiguity in the statute whence it springs, or those in *pari materia,* is to be resolved against the municipality, and the power is denied. Municipalities are to be confined within the limits that a strict construction of the grants of powers will assign to them. And the granted powers must be exercised in a reasonable manner. *Carron* v. *Martin,* 26 *N. J. L.* 594; *Public Service Electric, &c., Co.* v. *Camden,* 118 *Id.* 245, 255; *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518, 578; 4 *L. Ed.* 629; *Cooley Const. Lim.* (8th ed.) 391, 400." *N. J. Good Humor, Inc.,* v. *Bradley Beach,* 124 *N. J. L.* 162.

A municipality is merely a political subdivision or department of the state. It is an agency. *Jersey City* v. *Martin,* 126 *N. J. L.* 353. The municipality is the instrumentality

by which the government makes intimate and practical contact with the local interests of its citizens. The act of the instrumentality in taking unto itself the prerogative of indicting, by advertisements purchased with tax moneys, all of the departments of the government, present or prospective, in an effort to influence a statewide election is both novel and presumptuous.

Defendants cite in their behalf *Smathers v. Board of Freeholders,* 113 *N. J. L.* 281; *In re Taxpayers and Freeholders of Plattsburgh* (cited, mistakenly I believe, as *People* v. *Robert*), 50 *N. Y. Supp.* 356; *Farrel* v. *Town of Derby,* 58 *Conn.* 234; 20 *Atl. Rep.* 460; *Bachelder* v. *Epping,* 28 *N. H.* 354; *Meehan* v. *Parsons,* 271 *Ill.* 546; 111 *N. E. Rep.* 529 (1916), and *Denison* v. *Crawford County,* 48 *Iowa* 211. These cases do not lend strength to the defendants' case. The most that can be deduced from them is that they hold for the right of a municipal body to employ representatives to appear before a state legislature or before the national congress to present, for the consideration of those legislative bodies, the appeal of the municipality; an issue that has no resemblance to the one now before us.

The making of an appeal by a municipal governing body by advertisement of the sort, or in the manner, of the present advertisements, at public expense, or indeed without expense, has no support, so far as I have found, in the decisions of any jurisdiction, unless defendants are right in their contention that the opinion by which *In re Carrick,* 127 *N. J. L.* 316, was decided by this court in 1941 furnishes such support. That case was on an *application* for a writ of *certiorari* to review resolutions of the City of Jersey City authorizing the insertion of certain other newspaper advertisements. In denying the application the opinion closed with these words: "We have carefully examined the other matters argued and find no reason to review the same since the advertising has been paid for." The holding, as I understand it, was that the law requires diligence, that when the proceedings of a municipal corporation contemplate and result in the expenditure of public money objections must be made promptly, and that the applicants therein had not acted promptly and

therefore should be denied a writ; and the decisions cited by the opinion in support of the holding go no further than that. Beyond that decided point the statements in the opinion are, I believe, *dicta* and are not, and ought not to be, controlling. The *Carrick* decision was cited by these defendants in opposition to the allowance of the present writ when the application was being argued. It was considered by us, but we nevertheless granted the *allocatur*. *In re City Affairs Committee of Jersey City*, 132 *Id.* 237. The bills had not then been paid, and the November publications had not been had. Against the protest of the prosecutor and at the request of the defendants we withheld the customary stay, but the governing body was, by the allowance of the writ, put on notice and it proceeded thenceforth at its peril. Moreover, the fact that a municipality has incurred a debt or paid the bill does not necessarily spell *laches* on the part of one seeking or prosecuting a writ of *certiorari*. *Zeller* v. *Guttenberg*, 81 *Id.* 305 (before Garrison, Parker and Voorhees, JJ., opinion by Parker, J.) ; *Fagan* v. *Mayor and Council of Hoboken* (not officially reported), 83 *Atl. Rep.* 772 (before Parker and Bergen, JJ., *per curiam*) ; *Cooper* v. *Belleville* (not officially reported), 118 *Atl. Rep.* 332 (before Swayze, Parker and Black, JJ., *per curiam*) ; *Loudenslager* v. *Atlantic City, supra* (before Swayze and Voorhees, JJ., opinion by Voorhees, J.). The prosecutor was diligent; it could scarcely have been more so.

This is perhaps an appropriate place to note defendants' point that the prosecutor is not a proper party to prosecute the writ. The right of the prosecutor, specifically, to prosecute was considered and determined affirmatively at the allowance of the writ. The right, generally, of a taxpayer to prosecute a writ of *certiorari* to review any municipal or official action which tends to burden his taxing district with a debt has long been recognized. *Middleton* v. *Robbins*, 54 *N. J. L.* 566, 572. No proof has been adduced against the status of the prosecutor; and after the allowance of a writ of *certiorari* the status will be presumed in the absence of proof to the contrary. *Streeper* v. *Auditorium Kennel Club*, 13 *N. J. Mis. R.* 584.

Upon examining our statutes for a possible source of the city's authority to make paid advertisements I find no provision—and none is cited to us—which comes more nearly being pertinent than *R. S.* 40:48–1 (30) providing that "The governing body of every municipality may make, amend, repeal and enforce ordinances to * * *. Appropriate funds for advertising the advantages of the municipality." By no elasticity of argument may that authority be made to reach the present issue, and no such contention is made; on the contrary, the duly adopted budget contained two items under that statutory authority, one of $10,000 for "municipal publicity and advertising" and another of $25,000 for "industrial and other advertising," neither of which was resorted to for present purposes. That statutory provision indicates the legislative thought (1) that the governing body of a municipality, if it would spend public funds for advertising, must have statutory authority and (2) that the authority to so appropriate should be limited to the advertising of the advantages of the municipality.

It is said, however, that *R. S.* 40:48–2 gives the necessary statutory authority. When the *Good Humor* case, *supra,* was before the Supreme Court, it was argued, and there held (123 *N. J. L.* 21), that the general language of that section gave authority to the Borough of Bradley Beach to prohibit the vending of any goods from a vehicle, but the Court of Errors and Appeals, on the appeal, held otherwise, and, in reversing, enunciated the principle set forth in the language quoted above. I suggest that the grant of power in the cited section must be read as a whole and that due regard must be had for the qualifying clause at the end—"Any municipality may make * * * such other ordinances * * * not contrary to the laws of this state or of the United States, as it may deem necessary and proper * * * *and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.*" In my view this general authority is merely ancillary to specific authority elsewhere given. It would be an odd situation, indeed, if a municipality could do anything it deemed necessary and proper subject only to the limitation that there was no statute

to the contrary. That argument, carried to its finality, would mean that all of our statutes, other than the cited section, conferring powers on municipalities, are superfluous and that what the legislature must do, if it would limit the sphere of municipal action, is to enact a series of "shall not" statutes. *R. S.* 40 :72–3 is a correlative provision in the Commission Form of Government Act and is, I think, subject to the same comment. It is not phrased in precisely the same language and does not contain the same qualifying clause, but it does turn upon the provision that the municipality "shall have all the powers necessary for its government." I fail to see that anything now under review was necessary to the government of the municipality.

A municipal corporation is "a government of enumerated powers" and is to be confined "within the limits that a strict construction of the grants of powers will assign to" it. I find nothing in the named sections or in any other expressly granted power, or in any fair implication incident thereto, or in any indispensable and essential development from the declared objects and purposes of a municipal corporation, that will support the use of tax moneys to influence elections; much less to do so by printed diatribe and invective.

Where there has been an effort to use public funds to influence elections, courts elsewhere have uniformly held against the existence of authority. On an election in a California municipality to determine whether a bond issue should be had for the purpose of extending a municipal electric plant, it was held unlawful for the (municipal) Board of Public Service Commissioners, in the absence of specific charter authority, to expend funds in advertising to secure a favorable vote notwithstanding that course was considered necessary in order to correct misinformation disseminated among the voters of the city. *Mines* v. *Del Valle* (*California Supreme Court,* 1927), 257 *Pac. Rep.* 530. In *State, ex rel. Port of Seattle* v. *Superior Court* (State of Washington, 1916), 160 *Id.* 755, it was alleged that the Port Commissioners had unlawfully expended Port funds for the purpose of advertising. lobbying and printing circulars to defeat, at referendum, the operation of a statute intended to increase the number of

commissioners of the Port District and limit the amount of its indebtedness. The court, in holding that the commissioners had no authority to spend public moneys within its control in that way, said:

"If the port commissioners may take the money of the port, acquired by taxation upon property within the district or otherwise, for political purposes, or purposes other than those for which the port was organized, then there is no limit upon the port commissioners in expending the money of the port. The commissioners might determine that the best interests of the business of the port required that the individual members of the commission be perpetuated in office, and because of that reason, use the funds of the port to insure their own election. We are clearly of the opinion that when the port was created no thought was held by any person that the money raised by the port could be used for political purposes, or any purpose other than for the direct use of the port and its business."

The Supreme Court of Illinois, in *Elsenau* v. *City of Chicago,* 165 *N. E. Rep.* 129 (1929), wherein the city had incurred expense by way of advertisements in the daily press and on billboards to persuade the voters to approve certain bond issues, said: "The conduct of a campaign, before an election, for the purpose of exerting an influence upon the voters, is not the exercise of an authorized municipal function and hence is not a corporate purpose of the municipality."

If Jersey City has the disputed authority, so has every municipality. If the authority is such that any municipality may go before the public in this manner on any subject which the governing body may, in its broad discretion, consider is for the welfare of the community, and the courts have no control thereover, there seems to be an open field for demagogic and vituperative election appeals under official sanction and at the expense of the taxpayer. If tax funds may be used to publicize such appeals by newspaper advertisements, there seems to be no reason why they may not be so used—and the argument is that they may be—for radio broadcasting. It takes little imagination to picture the attendant confusion, including accusations and counter-accusations, without any

tribunal to keep the quarrel within bounds, if such a course is to be generally followed. Can it be said that this unprecedented and astounding assault by a municipality, a creature of the legislature, upon the state government presents no reasonable doubt about its legality? Or that the statute relied upon is so unambiguous that no doubt is left as to the conferred authority? If such a doubt exists, the issue should, under our cases, be resolved against the municipality. I am satisfied that the legislature never intended, and that there is no statutory enactment which may be soundly interpreted as intending, that tax moneys may be so used for the purpose of swaying public opinion at an election, or that such activities may be conducted in the name of organized government no matter who pays the expense. We need not decide whether the publication of an orderly statement of relevant facts would have been within the defendants' authority. There was no such publication and that issue is therefore not presented. The question is whether a scandalous philippic may lawfully be publicized in the name of a municipality and at the expense of the taxpayers of that municipality. I think that it may not.

The fact that an attorney gave advice to the commissioners favorable to their authority is of no consequence. Municipal authority is not conferred in that fashion.

I conclude that the commissioners had no authority to authorize the publication or to incur the expense of the disputed advertisements. The resolution, in my opinion, should be declared invalid.