MORRISON, J.
I dissent. In this case, we are not asked to review a budget item, but rather to construe a constitutional commandment that imposes limits on the legislative budget. The majority opinion leads to the result that the computers sitting on the desks of legislators are not their “equipment” and legal services they receive that are essential to the enactment of laws are not “operating expenses.” The People, in the course of adopting legislative reforms, could not have foreseen this result and I cannot join in the frustration of their clear purpose.
I
I agree the Legislature has the power to make lawful appropriations as it sees fit and structure and fund agencies of the state government: Peter F. Schabarum does not contest these powers. Within these powers the Legislature is free to parcel out the People’s money to whichever agencies it chooses. But that does not confer the power to decide which expenditures should “count” toward the constitutional limit the People have set for their Legislature. (See Nougues v. Douglass (1857) 7 Cal. 65, 79-80 (cone. opn. of Murray, C. J.) [“the Legislature cannot do, indirectly, what they are forbid from doing directly”].) Schabarum’s major premise, that the judiciary retains the duty of interpreting constitutional provisions, including Proposition 140, *1232 is correct. Courts have construed previous efforts to limit legislative spending. (Hilborn v. Nye (1911) 15 Cal.App. 298 [114 P. 801] [construing Cal. Const., former art. IV, §§ 23, 23a]; People’s Advocate, Inc. v. Superior Court (1986) 181 Cal.App.3d 316 [226 Cal.Rptr. 640] [construing Political Reform Act of 1983]; see Phillips v. Riley (1936) 6 Cal.2d 414, 416 [57 P.2d 1308] [distinguishing Hilborn].) Due to the passage of Proposition 140, the state Constitution now requires the Legislature to “count” all expenditures for its “operating expenses and equipment,” towards the limits decreed by the People.
However, Schabarum’s minor premise, that the judiciary has the power to review the implementation of the state budget, is flawed. It is up to the Legislature and the Governor to decide whether any particular amounts stated in a given budget are accurate. I would reject an interpretation of Proposition 140 that would cloak the judiciary with the mantle of “super auditor” of the budget.
II
I share the majority’s reluctance to interfere with the Legislature’s function to assess facts and, with the Governor’s function to provide a budget. Nothing implicates the heart of a democratic state more deeply than the power to tax the populace and decide what expenditures will best serve the state.
But here the Legislature has not made any pertinent factual findings. Further, the People, in the exercise of their reserved initiative powers— powers won in the populist struggle to rein in legislative corruption—have made certain factual findings and have spoken clearly about their wishes in this matter and I see no reason to impair their lawful exercise of power to regulate the amount of money the Legislature can spend on itself.
The substantive issue between the parties is whether the phrase “the total aggregate expenditures of the Legislature for the compensation of members and employees of, and the operating expenses and equipment for,” includes the services rendered to the Legislature by the Legislative Counsel Bureau. The Legislature argues that the phrase refers to and only to the budget line items of the Legislature itself. The Legislative Counsel similarly contends the fact the Legislative Counsel is not an actual part of the Legislature disposes of the case.
We are not reviewing a budget item, we are interpreting a constitutional commandment about how the legislative budget is to be limited. In other *1233 words, we are supposed to be deciding how broad the constitutional spending cap is, not whether a given budget amount in a past budget is or is not accurate. This case is about what standards the Legislature should be applying in deciding, factually, what is or is not within its spending limitation. To say the matter is not reviewable is wrong; even the Legislature concedes it could not simply reclassify its employees as agents and thereby evade court review of the budget.
At oral argument the Legislature stated: “The Legislature went back . . . and made some decisions about what was covered by Proposition 140. That is, the Legislature made its decisions about what were expenditures of the Legislature, who were employees of the Legislature and what were operating expenses and equipment of the Legislature.” I agree. The problem is, the Legislature made those findings using a flawed definition of the spending cap. Thus, the purported implied findings relied on by the majority opinion are meaningless and entitled to no deference whatsoever.
This is like a judge purporting to exercise discretion using the wrong criteria. In such a case we say the judge has abused that discretion because the judge applied the wrong legal standards. (See Bailey v. Taaffe (1866) 29 Cal. 422, 424.)
in
We should apply the fundamental rule that initiatives, like statutes, express meaning through language and not otherwise. (See People v. Knowles (1950) 35 Cal.2d 175,182 [217 P.2d 1].) Because of the context in which the initiative power was confirmed to the People, I would apply the rule that “the initiative power must be liberally construed, to promote the democratic process. . . . Indeed, it is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise.” (Legislature v. Eu (1991) 54 Cal.3d 492, 501 [286 Cal.Rptr. 283, 816 P.2d 1309], original italics, citation omitted.) We must ascertain what the average voter, reading the constitutional language, supplemented if necessary by the ballot materials, would have understood. (Id. at p. 505; see Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) If the Legislature’s textual interpretation of the provision reasonably accounts for the language used, it normally prevails. (See State Bd. of Education v. Honig (1993) 13 Cal.App.4th 720, 755-756 [16 Cal.Rptr.2d 727].) However, while “the Supreme Court has said that the Legislature’s interpretation of a constitutional term is relevant to an assessment of the intention of the electorate. . . . this canon of construction must be used with caution when *1234 interpreting an initiative measure. The Legislature is not always enamored with initiative measures enacted by the voters. The Legislature ought not to be able to frustrate the intent of the electorate by enacting statutes that frustrate the popular will. Consequently, although we will examine statutes enacted in light of the subject constitutional provision, we will continue to give greater significance to the will of the electorate itself.” (Hoogasian Flowers, Inc. v. State Bd. of Equalization (1994) 23 Cal.App.4th 1264, 1277-1278 [28 Cal.Rptr.2d 686], citation omitted.) This case should be viewed through the lens provided by Hoogasian Flowers.
The People, in the exercise of their reserved initiative powers (Cal. Const., art. IV, § 1) made the following express findings in Proposition 140:
“[T]he Founding Fathers established a system of representative government based upon free, fair, and competitive elections. The increased concentration of political power in the hands of incumbent representatives has made our electoral system less free, less competitive, and less representative.
“The ability of legislators to serve unlimited number of terms, to establish their own retirement system, and to pay for staff and support services at state expense contribute heavily to the extremely high number of incumbents who are reelected. These unfair incumbent advantages discourage qualified candidates from seeking public office and create a class of career politicians, instead of the citizen representatives envisioned by the Founding Fathers. These career politicians become representatives of the bureaucracy, rather than of the people whom they are elected to represent.
“To restore a free and democratic system of fair elections, and to encourage qualified candidates to seek public office, the people find and declare that the powers of incumbency must be limited. Retirement benefits must be restricted, state-financed incumbent staff and support services limited, and limitations placed upon the number of terms which may be served.” (Cal. Const., art. IV, § 1.5.)
The People addressed incumbent spending as follows: “In the fiscal year immediately following the adoption of this Act, the total aggregate expenditures of the Legislature for the compensation of members and employees of, and the operating expenses and equipment for, the Legislature may not exceed an amount equal to nine hundred fifty thousand dollars ($950,000) per member for that fiscal year or 80 percent of the amount of money expended for those purposes in the preceding fiscal year, whichever is less. For each fiscal year thereafter, the total aggregate expenditures may not exceed an amount equal to that expended for those purposes in the preceding *1235 fiscal year, adjusted and compounded by an amount equal to the percentage increase in the appropriations limit for the state established pursuant to Article XIII B.” (Cal. Const., art. IV, § 7.5.)
The relevant portion of the spending limit provides: “[T]he total aggregate expenditures of the Legislature for the compensation of members and employees of, and the operating expenses and equipment for, the Legislature may not exceed an amount equal to nine hundred fifty thousand dollars ($950,000) per member for that fiscal year . . . .” (Cal. Const., art. IV, § 7.5.)
The crucial phrase is “operating expenses and equipment for, the Legislature . . . .” “ ‘Operating expenses’ usually cover physical maintenance, and may include administration, labor, interest, taxes, rent, insurance, claims, litigation expenses, etc., depending upon how the phrase is used in a particular case.” (Powell v. City & County of S. F. (1944) 62 Cal.App.2d 291, 298 [144 P.2d 617].)
In Mandel v. Myers (1981) 29 Cal.3d 531 [174 Cal.Rptr. 841, 629 P.2d 935], the California Supreme Court had to determine whether an appropriation for “operating expenses and equipment,” which by budgetary definition included “supplies, equipment, services (other than services of state officers and employees), and all other proper expenses,” was broad enough to encompass payment of a an award of attorney fees. (At p. 543.) The court found it was, in part observing that “. . . the State Administrative Manual explicitly confirms that ‘consultant and professional services’ are among the categories included within the ‘operating expenses and equipment’ budget item.” (Ibid.) The dissent in that case, by Justice Richardson, is in accord: “Reasonably read, the terms ‘services’ and ‘proper expenses’ must refer to those routine services voluntarily incurred by, or at the direction of, the department itself in its day-to-day operations.” (29 Cal.3d at p. 555, italics added; see Butt v. State of California (1992) 4 Cal.4th 668, 699 [15 Cal.Rptr.2d 480, 842 P.2d 1240].)
The term “operating expenses” means “Those expenses required to keep the business running, e.g., rent, electricity, heat. Expenses incurred in the course of ordinary activities of an entity.” (Black’s Law Diet. (6th ed. 1990) p. 1091, col. 2, italics added.)
IV
The Legislature operated successfully for many years with minimal assistance. “At the first session of the California Legislature in 1850, legislative *1236 staff consisted of a parliamentarian, a recorder of minutes, a chaplain, a sergeant at arms, and an occasional supernumerary. This level of legislative support remained relatively unchanged for almost 70 years. It was not until the eve of World War I that legislative legal services were formally established.” (Wilson, California’s Legislature (1994 ed.) p. 123.) The Legislative Counsel was created in 1913 and its duties remain largely unchanged: “It is in charge of an official entitled chief of the bureau, whose duty it is to prepare and assist in the preparation, amendment and consideration of legislative bills, to advise as to needed revision of the statutes, to co-operate in the manner prescribed by law in the preparation of initiative measures, and to render to the Governor such service as the latter may request[.]” (Cal. Blue Book (1913-1915) p. 521; see Kleps, The Revision and Codification of California Statutes 1849-1953 (1954) 42 Cal.L.Rev. 766, 787-788 & fns. 84 & 85 [tracing bill through the Legislature, and opposition by state librarian, authored by then Legislative Counsel]; Hichbom, Story of the Cal. Legislature of 1913 (1913) pp. 357-359 [contemporaneous account of bill history].) According to the agency history written by the current Legislative Counsel, “The Legislative Counsel of California is the legal counsel to the Legislature and its Members. Assisted by a staff of over 60 attorneys, the Legislative Counsel is charged with the duty of providing any legal services which the Legislature and its Members may desire in connection with their legislative activities.” (Gregory, Legislative Counsel of Cal. (Cal. State Printing Office 1978) p. 1; see Beek, Cal. Legislature (Cal. State Printing Office 1960) pp. 33-35, 181, 205-209 [describing assistance provided by Legislative Counsel, authored by former long-time Secretary of the Senate].) The same history explains that the Legislative Counsel will be implementing “electronic data processing,” now the Legislative Data Center, “to aid in providing efficient, timely legal service to the Members of the Legislature” (Id. at p. 4; see Wilson, California’s Legislature, supra, pp. 95, 165) and acknowledges that some legal services are provided to various nonlegislators. (Id. at p. 2, fn. *; see e.g., Gov. Code, §§ 10232 [state agencies], 10234-10235 [Governor], 10237-10241 [judges], 10243 [initiative proponents].)
The Legislative Counsel points out the Legislative Counsel is appointed “by concurrent resolution at the beginning of each regular session” (Gov. Code, § 10201), two of his deputies are exempt from civil service (Cal. Const., art. VII, § 4, subd. (m)), the Legislative Counsel is wholly nonpartisan and is not technically part of “the Legislature.” Schabarum points out that under legislative rules, bills must be routed through the Legislative Counsel and therefore as presently structured the Legislature cannot function without the Legislative Counsel. For example, no legislator is permitted to introduce a bill “unless it is accompanied by a digest, prepared and attached *1237 to the bill by the Legislative Counsel, showing the changes in the existing law which are proposed by the bill.” (Sen. Cone. Res. No. 1, Stats. 1991 (1991-1992 Reg. Sess.) res. ch. 126,18.5, p. 6171; see Wilson, California’s Legislature, supra, pp. 93-94; California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 660-661 [59 Cal.Rptr.2d 671, 927 P.2d 1175] (dis. opn. of Chin, J.) [such digests useful].)
At oral argument the Legislature conceded that as presently structured it cannot pass laws without the input of the Legislative Counsel. “Q. So they could not operate without these services? A. Yes, but that doesn’t mean they’re an operating expense of the Legislature, or that the employees of the Legislative Counsel are necessarily operating expenses of the Legislature.” I disagree with this assertion. The core function of the Legislature is to legislate. By its own rules it cannot do so without the Legislative Counsel. It cannot “operate” in any meaningful sense without the Legislative Counsel. Perforce, the Legislative Counsel represents an operating expense.
It is true that the Legislative Counsel presently has a separate “line” in the budget. At oral argument counsel for the Legislative Counsel stated the Legislative Counsel has “never” been part of the Legislature’s budget. But the Legislative Counsel generally has been treated as “part” of the Legislature, at least in the summaries of the Governor’s Budgets. (See, e.g. Governor Richardson’s 1923-1925 Budget (Feb. 1, 1923) p. 2; Governor Warren’s 1952-1953 Budget (Mar. 3, 1952) p. A-32.) And the Legislative Counsel concedes it has been listed in the “legislative” portion of the Budget Act since 1925. (See Stats. 1925, ch. 30, p. 47.) It further appears the Legislative Counsel, until Proposition 140 appeared on the horizon, charged the Legislature for services. For example, in the 1988-1989 and 1989-1990 fiscal years, the Legislative Counsel’s budget reflects over $10 million in “reimbursements” from the Legislature, transfers from the Assembly Contingent Fund. (Stats. 1989, ch. 93, § 2.00, item No. 0160-001-001, p. 421; see Governor’s Budget, 1991-1992, pp. LIE 2, 6; Stats. 1988, ch. 313, item No. 0160-001-001, p. 1121; see Governor’s Budget, 1990-1991, pp. LEE 2, 6.) This reimbursement was not included in the 1990 budget bill (Stats. 1990, ch. 467, item No. 0160-001-001, p. 2095, approved July 31, 1990), and then disappears from the charts. The budgets immediately before 1990 explained the Assembly Contingent Fund as follows: “The funds appropriated in Schedule (d) are for contingent expenses of the Assembly including ... for support of joint services and joint house operations as provided [by Gov. Code, § 10200 et seq.], to be transferred by the State Controller to the Assembly Contingent Fund.” (Stats. 1988, ch. 313, p. 1120; Stats. 1989, ch. 93, pp. 419-420.) The statutory reference to Government Code section 10200 is to the Legislative Counsel, the duties of which have not changed since *1238 then. In the argot of budgeteers, a reimbursement is the “Amount received as a repayment of the cost of work, or service performed, or of the other expenditures made for or on behalf of another governmental unit or department.” (Krolak, California’s Budget Dance (1990) Glossary, p. 115.) This demonstrates the Legislative Counsel, like most providers of legal and other services, is capable of maintaining separate accounts for services performed for the Legislature and services performed for others (e.g., Governor, state agencies, and so forth). It should be a simple factual question how much “service” it renders and what equipment it supplies to the Legislature in a given budget year.
V
I infer the People employed the ordinary meaning of the words used in Proposition 140, which readily encompasses legal services and computers. It requires little, if any, “interpretation” to conclude that “operating expenses” means the routine expenses incurred in “operating” something.
In fact, the history of substantial reimbursements from the Legislature to the Legislative Counsel suggests the People intended that these items “count” toward the limit. Both before the adoption of Proposition 140 and to the present day, the budgets have contained a definition section which states: “Whenever herein an appropriation is made for support it shall include salaries and all other proper expenses, including repairs and equipment, incurred in connection with the institution, department, board, bureau, commission, officer, employee, or other agency, for which such appropriation is made.” (Stats. 1989, ch. 93, § 3, italics added; Stats. 1995, ch. 303, § 3.) The People would expect all expenses “incurred in connection with” the Legislature to be included in the line item therefor.
To conclude the People did not intend the ordinary meaning of operating expenses and to assume the Legislature may choose which operating expenses and equipment to “count” toward the ceiling, would be to allow the possibility that the Legislature could, inadvertently or by design, accomplish indirectly what is forbidden. The context of Proposition 140 supports this view. (See Hillbom v. Nye, supra, 15 Cal.App. at p. 305 [spending limit clauses “submitted to the people in response to a universal demand that the expenses of the legislature, in whatever form incurred, should be definitely limited”]; San Francisco Taxpayers Assn. v. Board of Supervisors (1992) 2 Cal.4th 571, 578 [7 Cal.Rptr.2d 245, 828 P.2d 147] “[t]he voters could not reasonably have intended such a result”]; accord, Legislature v. Eu, supra, 54 Cal.3d at p. 511 [“To hold that reform measures such as Proposition 140, which are directed at reforming the Legislature itself, can be initiated only *1239 with the Legislature’s own consent and approval, could eliminate the only practical means the people possess to achieve reform of that branch. Such a result seems inconsistent with the fundamental provision of our Constitution placing ‘[a]ll political power’ in the people. {Id., art. II, § 1.) As that latter provision also states, ‘Government is instituted for [the people’s] protection, security, and benefit, and they have the right to alter or reform it when the public good may require.’ (Italics added.)”].)
As stated, the Legislature contends the limitation applies to and only to the aggregate line items of the budget for the Senate and the Assembly. The Legislature makes much of the Constitutional provision stating “The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly,” leaving out the remainder of the provision, which states, “but the people reserve to themselves the powers of initiative and referendum.” (Cal. Const., art. IV, § 1.) The Legislature’s point is that “the California Legislature” is “the Senate and Assembly.” The Legislature insists that the People must have intended to reduce expenditures only of the Senate and Assembly, that is, by using the term “Legislature” the People necessarily meant that the section 7.5 limitation applied only to the line item of the budgets which are “for the support of’ those two houses of the Legislature. This argument does not account for the language, which embraces “the total aggregate expenditures of the Legislature for the compensation of members and employees of, and the operating expenses and equipment for” the Legislature. (Italics added.)
In a footnote the Legislature urges “Since the term ‘expenditures’ is modified by the phrase ‘of the Legislature,’ section 7.5 can only apply to the Legislature’s expenditures, and not to expenditures made by other entities on behalf of, or for, the Legislature. Any other reading renders the phrase ‘of the Legislature’ surplusage.” Not so: In a sense, all state monies are “expenditures of the Legislature.” Perhaps as a slip of the tongue the Legislative Counsel states: “The ‘natural and ordinary meaning’ of ‘expenditures of the Legislature, is ‘expenditures made by the Legislature.’ ” All expenditures are made by the Legislature. (See Cal. Const., art. IV, § 12, subd. (c).) The operative clause defines which of the expenditures are to be counted, namely those which are “for [1] the compensation of members and employees of, and [2] the operating expenses and equipment for, the Legislature^]” (Italics added.)
The Legislative Counsel contends that the “purpose” of Proposition 140 will not be furthered by including within the spending limitation that portion of the Bureau’s budget which consists of “operating expenses and equipment for” the Legislature. Not so. The People’s intent was to limit retirement benefits, incumbent staff “and support services,” as well as limit terms which *1240 could be served. (Cal. Const., art. IV, § 1.5, italics added.) “Support services,” encompasses legal and computer services. Further, the “intent” provision points out that “The ability of legislators to serve unlimited number of terms, to establish their own retirement system, and to pay for staff and support services at state expense contribute heavily” to incumbent advantages sought to be curtailed by the initiative, and concludes that to limit the power of incumbency “Retirement benefits must be restricted, state-financed incumbent staff and support services limited, and limitations placed upon the number of terms which may be served.” (Cal. Const., art. IV, § 1.5, italics added.) The services provided by the Legislative Counsel are, of course, “state-financed,” and represent a “state expense.”
The Legislative Counsel argues that for the first 40 years of its existence “legislative appropriations were subject to an expenditure cap similar to that contained in Proposition 140, which the Legislature and the Governor understood not to include” the Legislative Counsel, therefore we must presume the People understood that the Legislative Counsel would not be included within the spending limitation. But the former cap is dissimilar: It limited “the total expenses for officers, employees and attachés” of the Legislature. (Cal. Const., former art. IV, § 23, repealed Nov. 8, 1966.) The Legislative Counsel’s invocation of the maxim that long-standing interpretation is some evidence of meaning is unavailing. The Legislative Counsel points out the 1991-1995 budgets do not treat any costs of the Legislative Counsel as part of the Legislature’s budget. But five years is not a long time, and Schabarum filed suit in October 1992, therefore it cannot be said there has been any “longstanding” interpretation. (Whitcomb Hotel, Inc. v. Cal. Emp. Com. (1944) 24 Cal.2d 753, 757-758 [151 P.2d 233, 155 A.L.R. 405].)
As the Legislature has misunderstood the scope of the spending limitation, facts judicially noticeable lead to the conclusion that a large portion of the bureau’s cost should be counted toward the spending limitation.
VI
The People have the right to decide how much to spend on their government. It would be enough to conclude that some or all of the bureau’s costs to the People must be included as an operating expense. As to future budgets, except those which on their face (or coupled with facts judicially noticeable) demonstrate violation of the spending ceiling, “We must presume that the legislature before passing the act, and the governor before approving it, made inquiry” into the correct amounts and leave it at that. (Rankin v. Colgan (1891) 92 Cal. 605, 606 [28 P. 673]; see Stevenson v. Colgan (1891) 91 Cal. 649, 652-653 [27 P. 1089].) After all, the Governor *1241 takes an oath to obey the California Constitution, which enjoins that the Governor “shall see that the law is faithfully executed." (Cal. Const., art. V, § 1.) The Legislators individually through their oaths undertake similar fidelity to law. “If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned.” (Fletcher v. Peck (1810) 10 U.S. (6 Cranch) 87, 130 [3 L.Ed. 162, 176].)
The separation of powers doctrine forbids judicial inquiry behind the face of a statute. (See People v. Knowles, supra, 35 Cal.2d at p. 182.) This court has previously adhered to such distinction in the context of the constitutional prohibitions against gifts of public funds. (See now Cal. Const., art. IV, § 17, art. XVI, § 6.) In Dittus v. Cranston (1960) 186 Cal.App.2d 837 [9 Cal.Rptr. 314], we considered a contention that the Legislature sought to make a gift to the widow of a deceased senator. Such illegal purpose of the appropriated amount was not discernible from the face of the budget and facts judicially noticeable and therefore the challenge was denied. But in Gordon H. Ball, Inc. v. State of California ex rel. Dept. Pub. Wks. (1972) 26 Cal.App.3d 162 [102 Cal.Rptr. 637], it was possible (at pp. 170-173) to determine the invalidity of a statute facially providing extra compensation.
The Legislature should count in its budget all items of “support” from whatever source, which constitute normal operating expenses and equipment. Presumably the Legislature can detail the determination of its aggregate “support” to a committee which can investigate and report its conclusions. Thereafter, the Legislature can place the appropriate figures in the budget and the Governor will be in a position to review the accuracy of those figures, a task he undertakes prior to signing each budget. (Rankin v. Colgan, supra, 92 Cal. at p. 606; see Stevenson v. Colgan, supra, 91 Cal. at pp. 652-653.) The judiciary plays no role in this process.
The petition of appellant Peter F. Schabarum for review by the Supreme Court was denied April 15, 1998. Chin, J., and Brown, J., were of the opinion that the petition should be granted.